995 So.2d 247 (2008)
Pablo SAN MARTIN, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-831.
Supreme Court of Florida.
August 28, 2008.
Rehearing Denied November 17, 2008.
*249 Gustavo J. Garcia-Montes, Miami, FL, for Appellant.
Bill McCollum, Attorney General, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee.
*250 PER CURIAM.
Pablo San Martin, a prisoner under sentence of death, appeals the denial of his motion for postconviction relief. We have jurisdiction, see art. V, § 3(b)(1), (9), Fla. Const., and for the reasons explained below, we affirm.

I. FACTS AND PROCEDURAL HISTORY
The underlying facts are stated in our opinion affirming San Martin's convictions and sentences on direct appeal. See San Martin v. State, 705 So.2d 1337 (Fla.1997). We briefly summarize them. Danilo Cabanas, Sr. and his son, Danilo Cabanas, Jr., operated a check-cashing business in Medley, Florida. Id. at 1341. Because Cabanas Sr. had been robbed on a prior trip to pick up cash from the bank for his business, his son and a friend, Raul Lopez, regularly accompanied him to the bank. Id. On December 6, 1991, the men were driving from the bank in two cars. The Cabanases were in one vehicle, with Lopez following in another. Id. After leaving the bank with $25,000, and as they reached an intersection, they were "boxed in" by two Chevrolet Suburbans. Id. Two masked men began shooting at the Cabanases, and Cabanas Sr. returned fire. The assailants fled, but Lopez was shot and killed. Id.
San Martin orally confessed to the crime. Id. He admitted that several months before the crime, Fernando Fernandez had told him and Leonardo Franqui about Cabanas's check cashing business. They planned the robbery by watching Cabanas to learn his routine and they stole two Suburbans to "box in" the victims. Id. San Martin explained that he and Pablo Abreu drove in front of the Cabanases and Franqui pulled alongside so the victims could not escape. Id. He admitted initiating the robbery attempt and firing at the Cabanases, but denied firing at Lopez's vehicle. Id.
San Martin, Franqui, and Abreu were each charged with one count of first-degree murder, two counts of attempted first-degree murder with a firearm, one count of attempted robbery with a firearm, two counts of grand theft, and one count of unlawful possession of a firearm while engaged in a criminal offense. Id. Abreu negotiated a plea, testifying in the penalty-phase about the planning of the crime. Id. San Martin and Franqui were tried jointly. Id.
The jury found San Martin guilty on all counts and by a vote of 9-3 recommended death for the first-degree murder conviction. Id. at 1342.[1] The trial court found three aggravating circumstances: (1) prior violent felony convictions (armed robbery and armed kidnapping in one case and attempted first-degree murder and attempted robbery in another); (2) commission during the course of an attempted robbery and for pecuniary gain (merged); and (3) the murder was cold, calculated, and premeditated (CCP). 705 So.2d at 1342. The trial court found no statutory mitigators and only one nonstatutory mitigator"that San Martin was a good son, grandson, and brother who found religion in jail and displayed a good attitude in confinement." Id. San Martin was sentenced to death for the first-degree murder. He raised seventeen claims on direct appeal, and we affirmed. Id. at 1351.[2] In *251 October 1999, San Martin filed a shell postconviction motion, which he amended in April 2000. He raised thirty claims.[3]
*252 After conducting a hearing pursuant to Huff v. State, 622 So.2d 982 (Fla. 1993), the trial court summarily denied claims 1, 3, and 7-29. It denied claim 2 after conducting an in camera review, and claim 30 as moot.[4] The court granted an evidentiary hearing on claims 4, 5, and 6. The State agreed that San Martin's attempted murder convictions should be vacated pursuant to State v. Gray, 654 So.2d 552, 553 (Fla. 1995) (holding that there is no crime of attempted felony murder). Defendant later filed two supplements to his motion. The first argued that section 921.141, Florida Statutes (1993) is unconstitutional on various grounds. The second claimed that San Martin is mentally retarded.
The trial court held an evidentiary hearing on two separate dates. As to claim 4, the defense presented testimony from San Martin; and as to claims 5 and 6, from Pablo Abreu and Monica Jordan (a private investigator). The State presented testimony from defense trial counsel (Manuel Vazquez and Fernando de Aguero) and Marilyn Milian. The trial court denied relief. For the reasons explained below, we affirm.

II. ANALYSIS OF APPEAL
San Martin appeals the denial of claim 5 after an evidentiary hearing, and the summary denial of claims 3, 9, 10, 11, 12, 17, 25, and 29.[5] Below, we address San Martin's *253 claim regarding Abreu's false testimony (claim 5), followed by the summarily denied claims.

A. Abreu's False Testimony Claim
In claim 5, San Martin alleged that prosecutors pressured Pablo Abreu to give false penalty-phase testimony that before the robbery San Martin knew of the plan to kill Lopez. He asserted that without this testimony, no basis for the CCP aggravator remains. Although he did not cite Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), he appears to allege a Giglio violation. San Martin's claim is based on an affidavit signed by Abreu on March 29, 2000, indicating that neither he nor San Martin knew about a murder plan. It further indicates that prosecutors threatened Abreu with the death penalty if he did not testify that the men planned to kill Lopez and that San Martin knew that the murder would take place. The trial court denied the claim after an evidentiary hearing.
Marilyn Milian was one of the trial prosecutors. At the evidentiary hearing, she testified that "[u]nder no circumstances in this case or any other case would I ever tell a defendant who is flipping what to testify to or suggest to him that if he doesn't say it my way he won't have a plea agreement or force anybody to testify contrary to what it is truthfully happened." She further testified that no one threatened Abreu with the death penalty if he did not testify a certain way.
Abreu speaks little English and cannot read or write English. He testified at the evidentiary hearing that he believed the document he signed was a declaration that he was not the killer because he did not fire the shot that killed Lopez. Jordan, the investigator who took his affidavit, admitted that she does not speak Spanish and that an interpreter was not used in her discussions with Abreu. Abreu further testified that no one threatened him with the death penalty or forced him to answer questions in a particular way. Finally, he testified that the prosecutors did not tell him to testify that San Martin knew someone was going to get killed, and that his testimony and conversations with prosecutors have at all times been truthful. Thus, for purposes of appeal, San Martin's claim has shifted from one that prosecutors coerced Abreu to testify falsely that San Martin was aware of the plan to kill Lopez, to a claim that prosecutors knowingly presented false testimony as to when San Martin became aware of the plan.
At trial, Abreu testified only during the penalty phase. He testified that the men stole two large vehicles and parked them behind a building. The morning of the incident, they met at San Martin's house. Franqui gave each of them a weapon. They then left in Abreu's van to pick up the stolen vehicles. The men first did a drive-through of the operation with Abreu and San Martin in Abreu's van and Franqui in one of the stolen vehicles. When they saw that the victims had arrived at the bank, they left the van on the expressway, got into the stolen vehicle Franqui was driving, and drove to pick up the other stolen vehicle. San Martin got in one vehicle, with Abreu driving. Abreu and San Martin went ahead, and Franqui went by the bank. When the victims left the bank, Franqui contacted them on a walkie-talkie. They then conducted the ambush.
Abreu also testified that before the crime, the men discussed shooting Lopez. His trial testimony was unclear, however, about exactly when it was discussed. At times he suggested that Franqui, San Martin, and he discussed the plan a couple of days before the ambush. At other times, however, he suggested that they discussed it on the morning of the crime when the men conducted a dry run of the *254 robbery. At the evidentiary hearing, Abreu unambiguously testified that the plan to kill Lopez was first discussed on the morning of the incident.
We have described the elements of a Giglio violation as follows: "A Giglio violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." Green v. State, 975 So.2d 1090, 1106 (Fla.2008). False testimony is material "if there is a reasonable possibility that it could have affected the jury's verdict." Id. We apply a mixed standard of review to Giglio claims, deferring to the trial court's factual findings supported by competent, substantial evidence, but reviewing de novo the application of the law to the facts. Id.
The trial court found that San Martin's claim failed each of the Giglio prongs. We agree. Any difference between Abreu's trial testimony and his postconviction testimony concerns only the time when San Martin and Abreu became aware of the plan to kill Lopez. As noted above, however, this inconsistency was present within Abreu's trial testimony itself. Because of the ambiguity in Abreu's trial testimony on this issue, we cannot conclude that his testimony was false or that the State knew it was false.
Even if Abreu's inconsistent testimony could somehow be described as false, the inconsistency was not material. Abreu testified both at trial and at the evidentiary hearing that the men planned to kill Lopez to facilitate the robbery. Abreu's evidentiary hearing testimony reveals that San Martin and Abreu learned of the plan between thirty minutes and a couple of hours before the ambush, rather than, as suggested in portions of Abreu's trial testimony, possibly days before. The difference in timing makes no material difference. To support the CCP aggravator, we have not required that a plan be hatched days in advance. See, e.g., Alston v. State, 723 So.2d 148, 162 (Fla.1998) (upholding CCP where defendant had an opportunity to leave the crime scene and not commit the murder, but instead acted out a plan conceived during the period when the events occurred); Valle v. State, 581 So.2d 40, 48 (Fla.1991) (upholding CCP where approximately two to five minutes elapsed between the time the defendant left the police officer's car to get a gun and when he slowly walked back to shoot and kill the officer); cf. Phillips v. State, 984 So.2d 503, 512 (Fla.2008) ("A CCP killing demonstrates `that the defendant had a careful plan or prearranged design to commit murder before the fatal incident ...; that the defendant exhibited heightened premeditation.'" (quoting Franklin v. State, 965 So.2d 79, 98 (Fla.2007)) (emphasis added)). Therefore, even assuming the State knowingly presented false testimony about how long before the incident San Martin became aware of the plan to kill Lopez, there is no reasonable possibility that it could have affected the outcome of the proceeding. For these reasons, we affirm the denial of this claim.

B. Summarily Denied Claims
San Martin appeals the summary denial of claims 3, 9, 10, 11, 12, 17, 25, and 29. Many of these claims were insufficiently pled or have been waived.[6] We *255 therefore address only claims 3 and 9. In reviewing these claims, we acknowledge that an evidentiary hearing is required on postconviction claims unless "the motion and record conclusively show that the defendant is entitled to no relief." Blanco v. State, 963 So.2d 173, 178 (Fla.2007). We have explained, however, that "[a] defendant is entitled to no relief when his postconviction claims are legally insufficient, procedurally barred, or otherwise meritless." Id. We review the two preserved claims with this standard in mind.

1. Investigation and Presentation of Mitigation
In his first sub-claim in claim 3, San Martin alleged that counsel was ineffective for failing "to thoroughly investigate his background in preparation for the trial and failed to fully question and prepare Defendant's family in preparation for the mitigation phase."[7] Specifically, San Martin alleged that counsel failed to adequately interview him and his family about his background. He asserts that an adequate investigation would have uncovered testimony from several family members, as detailed below.
The Defendant alleged that his sister, Daisy San Martin, would have testified about the family's poverty when living in Cuba.[8] At trial, out of embarrassment, she minimized her father's drinking problems; however, her father was violent during drunken binges and would beat his children with belts, leaving welts and bruises. He tied Defendant to a table for up to three hours. When their parents fought, Defendant attempted to intervene.
Defendant alleged that his mother, Francisca San Martin, would have testified to several facts as well. She would have testified that Defendant was taken to a psychologist in Cuba when he was 7 or 8, but the psychologist did not evaluate him or prescribe medications; that Defendant was a bed-wetter until age 13 and a sleepwalker; that her husband did not provide for the family; that she separated from him because of his excessive drinking; and that her children all dropped out of school because of the family's poor financial situation. Finally, she would have testified that she knew her husband beat Defendant with a belt and kicked him with his work boots, and that when her husband returned home in a drunken rage, Defendant would intervene to defend her.
Defendant also alleged that his brother, Javier San Martin, would have testified that the family lived in dire poverty. He also would have testified that his father spent most of his money drinking and would come home drunk and argumentative. At his deposition and trial, Javier was embarrassed to talk about his father's drinking problems. He was never told that he should tell the court everything.
Finally, Defendant alleged that his father, Luis San Martin, Sr., would have *256 testified that he drinks a lot of beer, but he does not have a drinking problem. He would admit to tying up the Defendant for long periods of time and hitting him with a belt. He told his wife to take Defendant to a psychologist because he believed he was "a little crazy."
To prevail on a claim of ineffective assistance of counsel, San Martin must demonstrate: "(1) that his counsel's performance was deficienti.e., unreasonable under prevailing professional norms; and (2) that the deficiency prejudiced the defensei.e., that it undermines confidence in the outcome of the trial by creating `a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Rhodes v. State, 986 So.2d 501, 510 (Fla.2008) (quoting Valle v. State, 778 So.2d 960, 965-66 (Fla.2001) (quoting Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000))). The trial court summarily denied this claim, finding that trial counsel "cannot be faulted because the family was reluctant or refused to be more specific." The trial court also found a lack of prejudice because even if counsel had presented the additional mitigation evidence alleged, the mitigation would have been outweighed by the strong aggravation in this case. For the reasons explained below, we affirm.
With the exception of Defendant's father, who was available but did not testify, trial counsel presented testimony from each of these individuals during the penalty phase.[9] As to Defendant's father's violence and alcoholism and the family's poverty, the family testified inconsistently with the allegations in San Martin's post-conviction motion. Daisy San Martin testified that her parents always provided food and shelter and that her father is not an alcoholic. Francisca San Martin testified that she is separated from her husband because she does not like his drinking "but not because of anything bad." She testified that her husband has always worked hard to provide for his family. He is a good father and was never abusive to any of the children. She testified that her husband would hit Defendant when he needed discipline, "but he wouldn't leave a welt or anything." Finally, Javier San Martin testified that his family is loving, he had a good father, and his parents always provided a place to sleep and food to eat.
Defense counsel also presented testimony from Dr. Dorita Marina, a clinical psychologist. Defendant told Dr. Marina that his father drank a considerable amount of alcohol and had been abusive to the children in Cuba. Defendant also told Dr. Marina that his father "beat the children severely sometimes kicking, other times hitting with a closed fist or with a leather strap." Dr. Marina explained the inconsistency between Defendant's account and the family members' testimony as "a tendency for family members to deny things such as beatings by a father." She also explained that, as a result of denial, family members tend to keep a parent's alcoholism and resultant violence secret.
Given the family's trial testimony, counsel had little choice but to present evidence of abuse and alcoholism through another routeDr. Marinaand explain the family's contrary testimony as resulting from denial.[10] Counsel cannot be faulted for *257 failing to uncover testimony from Daisy, Francisca, and Javier San Martin regarding the family's alleged poverty or Defendant's father's abuse and alcoholism. See Correll v. Dugger, 558 So.2d 422, 426 n. 3 (Fla.1990) (recognizing that counsel cannot be faulted for failing to know of the defendant's alleged abusive background where the defendant and his mother gave "diametrically opposite testimony" at trial). In fact, in his postconviction motion, Defendant expressly recognized that Daisy and Javier San Martin were too embarrassed at trial to discuss their father's drinking problems.
Even if this new testimony were helpful, we have affirmed summary denials of postconviction claims where the background evidence counsel allegedly failed to present would have been cumulative. See, e.g., Downs v. State, 740 So.2d 506, 515 (Fla. 1999); Valle v. State, 705 So.2d 1331, 1334-35 (Fla.1997). Similarly, counsel is not ineffective where the substance of the testimony is presented through other witnesses, even if an alternate witness could have presented more detailed testimony. Darling v. State, 966 So.2d 366, 377 (Fla. 2007) ("[T]his Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.") (citing Gudinas v. State, 816 So.2d 1095, 1106 (Fla.2002), and Sweet v. State, 810 So.2d 854, 863-64 (Fla.2002)). Here, the testimony defense counsel allegedly failed to uncover about Defendant's father's abuse and alcoholism was presented through Dr. Marina. She testified that Defendant's father beat the children "severely" and had an alcohol problem. Thus, even assuming Defendant's family would testify as alleged in the postconviction motion (and contrary to their trial testimony), the testimony about Defendant's father's alcoholism and abuse would be cumulative of that presented through Dr. Marina.
As for Defendant's father (the only witness identified in the postconviction motion who did not testify at trial), the testimony counsel allegedly failed to uncover is that Luis San Martin, Jr. drinks a lot of beer, but does not have a drinking problem, and that he tied up the Defendant for long periods of time and hit him with a belt. Testimony that Defendant's father does not have a drinking problem would be of little help to Defendant. Testimony that he tied up the Defendant and hit him with a belt would be cumulative of Dr. Marina's testimony as to severe abuse at the hands of his father.
The only noncumulative testimony that defense counsel allegedly failed to uncover and present (that does not directly conflict with trial testimony) is that Defendant was taken to a psychologist as a child, was a bed-wetter until age 13, was a sleepwalker, and that his siblings were poor students. Even assuming counsel was deficient for failing to present this testimony, as well as the additional evidence of Defendant's impoverished upbringing and father's abuse and alcoholism alleged in this claim, we find no prejudice. The sentencing court found three statutory aggravators in this case: (1) prior violent feloniesattempted first-degree murder and attempted armed robbery in one case and armed robbery and armed kidnapping in another case;[11] (2) commission during the *258 course of a robbery merged with commission for pecuniary gain; and (3) CCP. In contrast, the court find only one (nonstatutory) mitigating factor. We have recognized that the CCP and prior violent felony aggravators, both present here, "are considered among the more serious aggravating circumstances." Anderson v. State, 863 So.2d 169, 188 (Fla.2003) (citing Larkins v. State, 739 So.2d 90, 95 (Fla.1999)). Significantly, San Martin's prior violent felonies include an attempted first-degree murder conviction and attempted armed robbery conviction in one case, and an armed robbery conviction and armed kidnapping conviction in another.[12]
The prior violent felony aggravator was supported by the following facts: In 1992, San Martin was involved in the armed robbery and armed kidnapping of Craig Richard Van Nest. Van Nest delivered automobile parts for an automobile parts distributor and wholesaler, and always carried cash. On the day of the incident, Van Nest made a scheduled stop in his work van. After he exited his vehicle, three men (later identified as San Martin, Franqui, and Carlos Vasquez) approached his van, and one began looking through the inside contents. After Van Nest returned to the vehicle, a man with a gun grabbed him by the back of the neck, pushed him into the van, and later struck him on the back of the neck with the gun, causing him to bleed. Van Nest was then forced into another vehicle driven by San Martin. After reaching a high rate of speed, they heard sirens, the vehicle crashed, and the men fled. San Martin admitted his involvement in the crime (that he drove the vehicle used to kidnap Van Nest) and that he had been informed of the plan the day before. San Martin was convicted of armed kidnapping and armed robbery.
Evidence also showed that in November 1991 San Martin was involved in the attempted first-degree murder and attempted armed robbery of a bank security guard, Pedro Santos. Santos testified that as he brought a bag from the bank building to the drive-in tellers, a car approached, and a passenger exited the car. The passenger told him to "let that go or you'll die," and fired a gun at him. The bullets did not hit Santos, and the assailant ran into the car and fled. San Martin admitted that he, Franqui, and Ricardo Gonzalez planned the robbery two days before and that he demanded the bag from the security guard and fired at him. San Martin was convicted of attempted first-degree *259 murder and attempted armed robbery.
Given the abundance of aggravation in this case, we find no prejudice. Even assuming counsel was deficient in failing to present the additional mitigation evidence, our confidence in the outcome is not undermined. The additional mitigating evidence would be insufficient to outweigh the significant aggravation. See. e.g., Correll, 558 So.2d at 426 (affirming summary denial of claim that trial counsel failed to present mitigation of drug and alcohol use and a deprived childhood, where "the additional evidence simply would not have made any difference" in light of the nature of the murders and the abundance of aggravation); Tompkins v. Dugger, 549 So.2d 1370, 1373 (Fla.1989) (finding no prejudice in failure to present evidence of an abused childhood and drug and alcohol addiction where the evidence would not have changed the outcome of the penalty phase).

2. Failure to Present Coordinated Psychological Testimony
In claim 9, Defendant raised seven sub-claims; the trial court summarily denied each of them. San Martin appeals the denial of the first and (it appears) second and fourth sub-claims. In the first sub-claim below, Defendant alleged that defense counsel rendered ineffective assistance by presenting inconsistent expert testimony. In his second sub-claim, he alleged that counsel rendered ineffective assistance by failing to develop psychological evidence of substantial brain damage, and that his trial experts failed to address other mitigating evidence. In his fourth sub-claim, Defendant alleged that defense counsel rendered ineffective assistance because defense experts did not interview San Martin's family, did not review any reports or documents, and failed to review statements or interview witnesses. He alleged that this failure limited the experts' ability to explain San Martin's conduct.
San Martin's argument on appeal is a vague combination of these claims, but he essentially raises two arguments regarding trial counsel's ineffective assistance: (a) in presenting inconsistent expert testimony (sub-claim 1 below); and (b) in failing to fully present Defendant's background (a combination of sub-claims 2 and 4 below). We address these arguments in turn.[13]

a. Inconsistent Expert Testimony
During the penalty phase, defense counsel presented testimony from two experts: Dr. Marina and Dr. Jorge Herrera. As detailed above, Dr. Marina testified about San Martin's father's alcoholism and abuse. She also testified that she spent about thirty hours evaluating San Martin. Through a diagnostic clinical interview, she learned about Defendant's background, including his life in Cuba, difficulties in school, work history, and his accident with scissors at age five, which caused severe eye damage. She also conducted numerous tests, including an IQ test, the Bender Gestalt, the Trail Making Test, the Rorschach Test, and the House-Tree-Person Test. San Martin received a comprehensive IQ score of 77, placing him in the borderline range of intellectual functioning. Dr. Marina found no indication of organicity in the Bender Gestalt, Trail Making Test, or intelligence testing. She explained that organicity "means an indication of neuropsychological dysfunction *260 which leads to something being truly wrong in some part of the brain." Dr. Marina similarly found no evidence of organicity in San Martin's psychosocial history. She testified that San Martin's responses on the Rorschach Test indicated a coping deficitthat is, difficulty solving everyday life problems. Based on the results of the Rorschach and House-Tree-Person Test, Dr. Marina found indicators of a narcissistic personality disorder. She also diagnosed San Martin with cyclothymia (mood swings).
Dr. Marina testified that since her initial diagnosis, she had reviewed an EEG and a brain mapping report prepared by Dr. Antonio Lourenco. They revealed an "asymmetry in the ... left temporal area" and "the midline frontal probably related to developmental immaturity." Dr. Marina testified that the report indicated immaturity in the brain and an organic problem in the left temporal and possibly frontal temporal lobes of the brain. She found these findings "extremely consistent" with her findings that San Martin is immature, exercises poor judgment, is easily led, and can become disorganized under pressure. She also found the findings consistent with San Martin's school records. In response to the State's suggestion that organicity and cyclothymia are mutually exclusive, Dr. Marina explained that when she made her diagnosis, she had no indication of organicity, so she attributed San Martin's hypomanic and depressive mood swings to cyclothymia. She explained that when doctors do not know of an organic condition creating hypomanic and depressive episodes, they call it cyclothymia. After reviewing the EEG indicating organicity, however, she attributed the same episodes to an organic condition rather than cyclothymia. Dr. Marina found the statutory mitigating factor of commission under the influence of extreme mental or emotional disturbance applicable. As for nonstatutory mitigation, she testified that San Martin has low intelligence, a learning disability, an impoverished background, and a narcissistic personality; that he expressed remorse; and that a structured jail environment will keep him and others safe. She did not find that San Martin's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was impaired.
Dr. Herrera, a neuropsychologist, testified that he spent about four hours examining San Martin. San Martin told him about the crime and gave him some personal background, including school and work history, and reported three accidentsone involving scissors to his eye and the other two in his teenage years involving head trauma. Dr. Herrera also administered an extensive battery of tests. He had the benefit of the results of Dr. Marina's testing and found, consistent with Dr. Marina's findings, that San Martin's IQ is 75. The results of the Trail Making Test, however, were not consistent. While Dr. Marina found San Martin was within normal limits, Dr. Herrera found San Martin's performance indicative of someone with a disturbance of the left hemisphere of the brain. Dr. Herrera explained the difference, indicating that frequently a patient with an electrical functional disturbance will do better on a task on one day than another. San Martin also did poorly on the Verbal Fluency Test, which is a frequent finding in patients who have lesions to the front portions of the left temporal lobe of the brain. His performance on the Rey Auditory Verbal Learning and Semantic Memory Tests was also indicative of a problem with the left temporal lobe. Dr. Herrera's initial diagnosis was that San Martin had suffered traumatic head injury to the inside portions of his left temporal lobe. He recommended an EEG, which counsel asked Dr. Lourenco *261 to perform. Dr. Herrera testified that the EEG confirmed his diagnosis of a left temporal lobe problem.
Dr. Herrera testified that San Martin's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. He also testified that San Martin is easily led, suffers from a learning disability, is remorseful, and would do well in a structured environment. However, Dr. Herrera did not find the statutory mitigating factor of extreme mental or emotional disturbance applicable.
The State presented testimony from Dr. Charles E. Mutter. In his opinion, the results of the EEG had no clinical significance. Dr. Mutter further testified that he found no evidence of mood swings or cyclothymia, and that cyclothymia and organic dysfunction are incompatible. Dr. Mutter testified that, based on his discussion with San Martin, at the time of the offense San Martin knew the difference between right and wrong and the consequences of his actions. He also testified that he saw no clinical evidence of a mental disturbance (psychological or organic) that made San Martin so impaired that he did not appreciate the criminality of his conduct. Finally, he found no evidence that at the time of the crime San Martin was suffering from an extreme emotional or mental disturbance.
In his postconviction motion, Defendant alleged that trial counsel rendered ineffective assistance by calling conflicting experts. Specifically, he argued that counsel presented conflicting evidence from Drs. Marina and Herrera as to organicity and statutory mental mitigating factors. He alleged that "[t]he presentation of both psychologists was self-defeating and highly prejudicial to the defense" because "[w]hatever persuasive mitigation argument the defense attempted to advance was, in effect, shattered by the contradictory nature of the testimony" and "[t]he two statutory mitigators the defense wished to secure were undermined by their own experts." The trial court summarily denied this claim. We affirm.
As detailed above, the testimony of Drs. Marina and Herrera was consistent in many respects, including San Martin's IQ, his remorse, and the benefit of a prison environment. However, it was inconsistent as to whether tests demonstrated organicity (although Dr. Marina later found organicity after reviewing Dr. Lourenco's report) and reports of accidents (San Martin reported the damage to his eye and two head traumas to Dr. Herrera, but only the eye injury to Dr. Marina). More importantly, the testimony was inconsistent on statutory mental mitigating factors. Dr. Marina found one statutory mitigating factor applicable (commission under the influence of extreme mental or emotional disturbance), but not the other (impairment of the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law). Although Dr. Herrera also found one statutory mitigator, his findings were the reverse of Dr. Marina's.
While there were certainly inconsistencies in the expert testimony, to establish ineffective assistance of counsel, San Martin must demonstrate deficient performance and prejudice. E.g., Rhodes, 986 So.2d at ___. "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). Moreover, "[c]ounsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions." Id. Here, Defendant's postconviction motion, *262 alleging that "[t]he defense gambit [of presenting both experts] backfired badly," essentially concedes that counsel made a strategic decision. San Martin does not allege that counsel failed to uncover the inconsistencies in the expert testimony. To the contrary, the record reflects that the experts' depositions were taken, Dr. Herrera had the benefit of Dr. Marina's findings, and on direct examination of Dr. Herrera defense counsel brought out both consistencies and inconsistencies in the experts' testimony. Thus, the trial court was essentially presented with a motion alleging counsel was ineffective for making a strategic decision to present both experts.
Even assuming counsel's presentation of conflicting expert testimony constituted deficient performance, however, San Martin cannot establish prejudice. San Martin essentially alleged that presentation of both experts undermined the ability to establish organicity and, in particular, the two statutory mental mitigating factors. In rejecting the extreme mental or emotional disturbance aggravator found by Dr. Marina, however, the trial court only "noted" the inconsistency in the defense experts' testimony, and in rejecting Dr. Marina's conclusion relied on the State's expert and the facts of this and San Martin's other crimes:
Regardless of this contradiction among defendant's own experts, it takes a quantum leap to find the statutory mitigator here in question from a diagnosis of mild mood swings.
....
.... [T]he court is persuaded by Dr. Charles Mutter's well reasoned opinion that the defendant simply made choices which were oriented to improve the defendant's financial situation and that the defendant was not acting under the influence of extreme mental or emotional disturbance. The facts support Dr. Mutter's conclusions.
The single most significant aspect of this case and of the defendant's other violent crimes is planning....
In the November 29, 1991 attempted robbery and attempted murder of Pedro Santos the evidence established that the defendant and his co-defendants met at the Dennys restaurant which adjoins the Republic National Bank in question. From there they observed the bank security guard carry a bag from the bank to the drive-in teller. Believing that the guard was carrying money the defendant and his friends planned the crime. The defendant and his co-defendants planned and engineered the theft of cars to facilitate the robbery. Having planned the robbery for the following day they were frustrated by the Thanksgiving holiday and had to postpone their plans for the next day. On the Friday after Thanksgiving they executed their plans and attempted the robbery. Every action of the defendant was meaningful and goal oriented. The object of his efforts was money and, as future events would show, never on a small scale.
On January 14, 1992 the unfortunate object of the defendant's attention was Craig Van Nest. Once again the defendant acted in an organized and goal oriented manner.... The defendant and his co-defendants approached Van Nest while the latter was driving his car. They tried to pull him over by identifying themselves as police officers, yet another example of the planning that went into the commission of these crimes. When Van Nest refused to stop his vehicle he was followed to his destination where he was pistol whipped by one of Mr. San Martin's co-defendants *263 and then kidnapped by San Martin and Franqui.
This defendant's premeditating and calculating nature was most clearly set out in the present case. This was the most thoroughly planned of the defendant's crimes. The victims were stalked. Their routines were studied. Their relative functions were analyzed. Trucks were stolen so they could be used in the robbery the next day. A get-away vehicle was placed at a pre-arranged location so that the stolen trucks could be abandoned and escape could be more discreetly achieved. Masks were used so as to make identification impossible. Gloves were used so that no identifying fingerprints would be left behind. The ambush was arranged to occur in a somewhat isolated location. The victims' cars were efficiently blocked to prevent escape. Raul Lopez was assassinated to prevent resistance. Finally, it is obvious, whether pre-planned or not, that the defendant and his accomplices never intended to "ask" for the money in question. They all exited their vehicles firing their weapons at Raul Lopez and the Cabanas[es]. The defendants San Martin and Abreu showered the windshield of the Cabanas[es] car with gunfire before any request for money was made. Thus violence was not something reserved for the uncooperative victim but was an integral part of the plan.
The facts in all of these cases belie Dr. Marina's suggestion that the defendant acted while under extreme mental or emotional disturbance on December 6, 1991.
Similarly, with regard to the other statutory mental health mitigator (inability to appreciate the criminality of his conduct or conform to the requirements of law) the sentencing court only noted the inconsistency between Drs. Herrera and Marina, and relied instead on the facts of the case and the State's expert:
The ultimate issue in determining whether this mitigator applies is simple, was the defendant substantially impaired in his ability to appreciate the criminality of his conduct on December 6, 1991? The answer lies in an evaluation of his behavior on that day. The evidence established that the defendant and his associates knew that the Cabanas[es] had been robbed in the summer of 1991 and that they were being particularly careful when the idea for the robbery first arose.... On the day in question, the day Dr. Herrera concludes the defendant's ability to appreciate the criminality of his conduct was impaired, the defendant wore a stocking mask and gloves to the crime.... If, in fact, his ability to appreciate the criminality of his conduct was substantially impaired why was he so desp[e]rately concealing his identity? Why did he feel it necessary to steal two trucks in which to commit the act if he did not fully understand its criminal implications? Why leave a get-away vehicle strategically parked on the Palmetto expressway to facilitate a discreet escape if nothing criminal had just occur[r]ed? ... This court finds that the defendant at all times knew exactly what he was doing and had a full understanding as to its criminal nature and consequences. The court also rejects the suggestion that the defendant was impaired in his ability to conform his conduct to the requirements of law.
Thus, in rejecting the statutory mental mitigators the trial court did not rely on the inconsistent defense expert testimony. Instead, it found the defense experts' findings inconsistent with the facts of the case, and accepted the State's expert's explanation as consistent with the facts. *264 Therefore, even assuming counsel was deficient in presenting inconsistent expert testimony from both experts, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," i.e., our confidence in the outcome is not undermined, and San Martin cannot establish prejudice. Rhodes, 986 So.2d at 510 (quoting Valle v. State, 778 So.2d 960, 965-66 (Fla.2001)). We affirm the trial court's summary denial of this claim. See, e.g., Kimbrough v. State, 886 So.2d 965, 983 (Fla.2004) (affirming summary denial of ineffective assistance of counsel claim where defendant failed to establish prejudice); Griffin v. State, 866 So.2d 1, 16 (Fla.2003) (same).

b. Failure to Prepare
In sub-claim 2 of claim 9 below, San Martin alleged that his attorneys rendered ineffective assistance by failing to present or develop psychological evidence. In sub-claim 4 of claim 9 below, San Martin alleged that defense experts failed to review the case properly because they "never met with or talked to Defendant's family, never reviewed any reports or documents in the case, and never reviewed statements or interviewed witnesses in the case." The trial court summarily denied these claims. We affirm.
On appeal, San Martin argues that counsel rendered ineffective assistance by failing to fully present San Martin's background due to failure to develop adequate contact with his family. To the extent San Martin claims ineffective assistance of counsel because Dr. Marina's testimony about San Martin's background conflicted with that of his family, the claim is without merit because, as explained above, at trial San Martin's family refused to acknowledge poverty, abuse, or alcoholism. Again, counsel (and experts for that matter) cannot be faulted for failing to uncover and develop mitigating evidence where the witnesses having such information gave contrary testimony at trial. See Correll, 558 So.2d at 426 n. 3. San Martin's primary argument is that Dr. Marina did not meet with his family, "leaving Mr. San Martin's explanation of his life as presented by Dr. [Marina] appearing as a falsehood since his own mother denied the alleged abuse." Indeed, Dr. Marina admitted that she did not speak with San Martin's family, victims, or detectives, and did not read depositions or San Martin's confession. However, she explained that she does that on purpose because she likes "to go and I like to do what is referred to as blind testing. I don't want data to influence me. I don't want reports of any kind to influence me. I want to see what I discover on my own." Counsel cannot be deficient for failing to require an expert to meet with Defendant's family, contrary to her normal practice. Further, given that San Martin's family denied the poverty, abuse, and alcoholism reported by San Martin to Dr. Marina, it is unclear how meeting with the family could have informed an expert's opinion or resolved inconsistencies between the expert testimony and testimony from San Martin's family. Finally, Dr. Marina was aware of the inconsistency and explained it as a tendency for family to deny alcoholism and abuse.
Even assuming deficient performance, however, there is no prejudice. As detailed at length above, San Martin's death sentence is supported by substantial aggravation, including commission during the course of a robbery/for pecuniary gain, CCP, and a number of significant prior violent felonies. See, e.g., Anderson, 863 So.2d at 188 (recognizing that the CCP and prior violent felony aggravators are among the more serious aggravators). Again, Defendant's prior violent felonies include armed robbery and armed kidnapping *265 in one case and attempted first-degree murder and attempted robbery in a separate case. Even assuming counsel was deficient for failing to ensure that defense experts fully explored San Martin's background and for failing to ensure that inconsistencies in their testimony were resolved, there is no prejudice. The inconsistencies in the testimony and the allegedly undiscovered background information are not sufficient to outweigh the abundance of aggravation in this case. For these reasons, our confidence in the outcome of the proceeding is not undermined, and we affirm the summary denial of this claim.
For the foregoing reasons we affirm the denial of San Martin's motion for postconviction relief.
It is so ordered.
QUINCE, C.J., and WELLS, LEWIS, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which ANSTEAD, J., concurs.
PARIENTE, J., concurring in part and dissenting in part.
I dissent in part because I disagree that San Martin's claim regarding the conflicting testimony of two expert witnesses should have been summarily denied. In this case, the substance of San Martin's allegations is that counsel presented contradictory expert witness testimony of two psychologists, which "was self-defeating and highly prejudicial to the defense." San Martin argues that "[w]hatever persuasive mitigation argument the defense attempted to advance was in effect, shattered by the contradictory nature of the testimony" and "[t]he two statutory mitigators the defense wished to secure were undermined by their own experts." The trial court summarily denied the claim by adopting the State's response, which asserted that it is "clear from the record that counsel made a strategic choice to put on both mental health experts" and that this "type of Monday morning quarterbacking does not sustain a claim of ineffective assistance of counsel under the standards of Strickland v. Washington."
If these conclusions had been reached after an evidentiary hearing, I could understand our affirming the trial court's denial of this claim if its findings were in accord with testimony that trial counsel had indeed made a reasonable strategic decision. However, "we have strongly urged trial courts to err on the side of granting evidentiary hearings in cases involving initial claims for ineffective assistance of counsel in capital cases." Floyd v. State, 808 So.2d 175, 183 (Fla.2002); see also Cook v. State, 792 So.2d 1197, 1205 (Fla.2001) (Pariente, J., concurring).
In this case, trial counsel's two experts, Drs. Dorita Marina and Jorge Herrera, completely contradicted each other on a critical issue. Dr. Marina found the extreme mental or emotional disturbance statutory mitigator applicable but did not find that San Martin's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. Dr. Herrera's testimony was just the reverse, finding the extreme mental or emotional disturbance mitigating factor inapplicable, but finding San Martin's capacity to appreciate the criminality of his conduct substantially impaired.
Even more significant, Dr. Herrera testified as to the existence of organic brain damage, which he stated was confirmed by an EEG conducted by Dr. Antonio Lourenco. Conversely, Dr. Marina initially found no indication of organicity, but diagnosed San Martin with "cyclothymia" or mood swings. She then changed her opinion *266 on the witness stand after reviewing the EEG and concluded that San Martin's mood swings were attributable to an organic condition. Not surprisingly, the State seized on these inconsistencies during closing argument:
Dr. Marina tells you no organicity. Dr. Herrera, organicity. Dr. Marina, no evidence of any substantial impairment, he knew right from wrong.
Dr. Herrera, he didn't know the nature and consequences of his acts.... Dr. Marina, he was suffering from an extreme mental or emotional disturbance.
Dr. Herrera, no he wasn't. He wasn't suffering from an extreme emotional disturbance and he had no psychological pathology. He had no mental disturbances at all.
We have in the past understood the potentially devastating effect of presenting contradictory evidence. See Barnhill v. State, 834 So.2d 836, 852-53 (Fla.2002) (concluding that the trial court did not err in giving little weight to the fact that Barnhill suffered from frontal lobe impairment where the defendant's experts disagreed as to the existence of the condition); cf. Pietri v. State, 885 So.2d 245, 266 (Fla.2004) (rejecting defendant's ineffective assistance claim challenging counsel's investigation and presentation of mental health mitigation where the defense expert testimony conflicted as to the existence of the two statutory mental health mitigators). Indeed, this Court has generally accepted the notion that refusing to present expert testimony that contradicts the image counsel attempts to portray is a valid strategic choice. See Philmore v. State, 937 So.2d 578, 586 (Fla.2006) (concluding that presenting "conflicting expert opinion would have further undermined the defense's credibility"); Hannon v. State, 941 So.2d 1109, 1131 (Fla.2006) (rejecting ineffective assistance claim where introduction of mental health mitigation would have contradicted the nonviolent image counsel attempted to portray of defendant and would have been inconsistent with the defense's claims of innocence); Jones v. State, 855 So.2d 611, 618 (Fla. 2003) ("[T]he evidence supports the trial court's conclusion that the testimony of appellant's experts at the evidentiary hearing conflicted with regard to diagnosis, the interpretation of the information provided them, and the applicability of mitigators, and defense counsel cannot be deemed ineffective for not presenting these conflicting opinions.").
Here, the experts' conflicting testimonies effectively canceled out each others' opinions, which appears to have directly affected the trial court's refusal to find the mental health mitigators. The trial court found no statutory mitigators and found only one nonstatutory mitigator"that San Martin was a good son, grandson, and brother who found religion in jail and displayed a good attitude in confinement." San Martin, 705 So.2d at 1342. Although the majority opinion determines as a matter of law that there could be no prejudice by stating that the trial court simply "noted" that the experts' testimonies conflicted, the majority stops short of explaining exactly what the trial court notes: "It is interesting to note before beginning an analysis of Dr. Marina's diagnosis and conclusions that the defendant's second expert, Dr. Jorge Herrera, concludes that the defendant does not suffer from extreme mental or emotional disturbance." This "note" indicates that the contradiction was a factor in the court's ultimate decision to reject the statutory mental health mitigator. The trial court further explains in discrediting Dr. Marina's diagnosis of "cyclothymia" that "this diagnosis is inconsistent with the findings of other defense *267 experts that the defendant suffers a mild organicity."
Moreover, in considering the effect of deficient penalty-phase performance, we must look to its effect on the jury that first makes a death or life recommendation. Notably, San Martin was not the shooter; his codefendant Franqui fired the fatal shot killing Lopez. Id. In fact, in a subsequent case involving a separate murder, the jury recommended that San Martin receive a life sentence after testimony was presented by only Dr. Herrera and Dr. Lourenco. Our recitation of the facts in that case indicates:
During the penalty phase, the State presented evidence of San Martin's three previous violent felony convictions (armed kidnapping and armed robbery; aggravated assault and attempted robbery with a firearm; and first-degree murder, attempted first-degree murder, and armed robbery with a firearm). Dr. Antonio Lourenco and Dr. Jorge Herrera, two defense mental health experts who examined San Martin and administered a number of tests, testified that San Martin had a lesion on the left side temporal lobe of his brain and had borderline intelligence. A church deacon testified that San Martin had become a Christian while incarcerated. His family members testified that he was a good son and brother, had been hyperactive as a child, and had been physically abused by his alcoholic father. The jury recommended a life sentence for San Martin.
San Martin v. State, 717 So.2d 462, 465 (Fla.1998) (footnote omitted).[14] While I realize the facts of the crime were different, my point is that without the benefit of an evidentiary hearing, we cannot rule out the possibility that the jury in this case would have recommended a life sentence if the expert testimony had been properly presented.
Without understanding whether trial counsel had strategic reasons for presenting the testimony of two experts who gave starkly different opinions, which should be developed at an evidentiary hearing, I am unable to conclude that the record conclusively refutes that counsel was not deficient. Just as the majority speculates that counsel had a strategic reason, it could be equally argued that counsel presented conflicting testimony due to poor preparation. Moreover, we cannot state conclusively that there was no prejudice where the prospect of either the jury or the judge finding a powerful statutory mitigator was eviscerated by the contradictory testimony of the experts.
I certainly agree that there are cases where prejudice can be conclusively refuted by the record but this is not one. Our determination of prejudice demands a qualitative review of counsel's performance and its effect on the outcome of the proceedings and, in my view, there is simply no way of evaluating what effect the contradiction in the experts' testimony may have had on the fairness of the penalty phase without an evidentiary hearing.
The cases cited by the majority to support its finding of no prejudice are simply not on point. For example, the majority cites to Griffin v. State, 866 So.2d 1, 16 (2003), and Kimbrough v. State, 886 So.2d 965, 983 (Fla.2004), both of which involved a claim of improper closing argument. However, the determination of whether an argument was in fact improper or whether any prejudice ensued from an isolated improper *268 comment can often be determined from the record itself. That is very different from claims involving the manner in which penalty-phase testimony has been presented or omitted. Further, the majority's reliance on Valle v. State, 778 So.2d 960, 965-66 (Fla.2001), and Rhodes v. State, 986 So.2d 501, 510 (Fla.2008), modified, 986 So.2d 560 (Fla.2008), is misplaced because both of those cases involved a denial of an ineffective assistance of counsel claim regarding penalty-phase issues after an evidentiary hearing.
This is literally a life-or-death matter, which is why if there is a debatable claim and the allegations are not conclusively refuted by the record, we mandate an evidentiary hearing. In this case, the trial court should have held an evidentiary hearing on the inconsistent expert testimony claim to ensure that we can state that our confidence in the outcome of this penalty phase is not undermined by any alleged deficient performance by trial counsel.
ANSTEAD, J., concurs.
NOTES
[1] Franqui was also sentenced to death, and we affirmed. Franqui v. State, 699 So.2d 1312, 1329 (Fla.1997).
[2] These claims were:

(1) the jury was death-qualified and San Martin was denied individual sequestered voir dire of the prospective jurors; (2) the trial court denied San Martin's motion to sever his trial from codefendant Franqui which violated his Confrontation Clause rights because Franqui's confession incriminating San Martin was admitted into evidence at their joint trial; (3) the court admitted into evidence San Martin's and Franqui's statements to the police; (4) and (5) the evidence was insufficient to sustain the conviction for premeditated murder; (6) the prosecutor commented on San Martin's right to remain silent; (7) the general verdict form did not specify whether the jury found San Martin guilty of premeditated or felony murder; (8) San Martin was denied the use of experts at trial; (9) the State's mental health expert misstated the law relating to mitigating circumstances and the trial court erred in subsequently rejecting San Martin's claimed mitigating circumstances; (10) the trial court erred by instructing the jury on the CCP aggravating circumstance and by finding that CCP was applicable; (11) the trial court prohibited either argument or instruction to the jury regarding the potential imposition of consecutive sentences; (12) defense counsel was prohibited from fully cross-examining State witnesses who testified about San Martin's past convictions; (13) the trial court failed to instruct the jury as to specific non-statutory mitigating circumstances that San Martin claimed were applicable; (14) the death penalty statute and instructions unconstitutionally shift the burden to the defendant to prove that a death sentence is not warranted; (15) the death penalty statute is unconstitutional; (16) numerous instances of prosecutorial misconduct rendered the trial unfair; and (17) the trial court made reference to a separate, and at the time untried, charge against San Martin for the murder of a police officer.
San Martin, 705 So.2d at 1342.
[3] These claims were: (1) denial of effective postconviction representation due to a lack of funding, understaffing, and counsel/investigator workload; (2) denial of due process and equal protection because various State agencies withheld public records; (3) ineffective assistance of counsel for (a) failure to investigate Defendant's background and to fully question and prepare Defendant's family; and (b) failure to cross-examine witnesses; (4) ineffective assistance of counsel for preventing Defendant from testifying at trial; (5) prosecutors improperly pressured Abreu to falsely incriminate Defendant as a participant in the plan to kill Lopez; (6) the prosecutors' actions in pressuring Abreu violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (7) ineffective assistance of counsel during voir dire; (8) ineffective assistance of counsel for failure to object to improper prosecutorial arguments; (9)(a) ineffective assistance of counsel for presentation of conflicting expert witnesses; (b) ineffective assistance of counsel for failing to present or develop psychological evidence; (c) ineffective assistance of counsel for failing to clarify test findings; (d) failure of defense experts to properly review the case; (e) ineffective assistance of counsel for failure to call a clinical social worker; (f) improper limitation of cross-examination of the State's expert; (g) the Defendant should not be executed because of his low IQ; (10) cumulative errors, including (a) improper convictions for attempted felony murder; (b) ineffective assistance for failure to object to admissibility of Defendant's statements as a result of purposeful delay in arrest; (c) police improperly approached the Defendant after he invoked his right to counsel in another case; (d) ineffective assistance of counsel for failure to consult with Defendant regarding replacement of a juror; (e) erroneous denial and ineffective assistance of counsel in arguing grounds for suppression of Defendant's confession; (f) the trial court erroneously announced a presumption of death against Defendant as a result of his prior convictions; (g) ineffective assistance of counsel for failure to object to the trial court's error in pushing expert testimony late into the evening; (h) ineffective assistance of counsel for failure to move for a mistrial due to actions of the victim's widow; (i) ineffective assistance of counsel for failing to consult Defendant regarding juror note-taking; (j) transcript errors denied Defendant a fair trial; (k) ineffective assistance of counsel for failure to seek sanctions against the prosecutor or move for a mistrial as a result of improper prosecutorial conduct; (l) the trial court erred in failing to adequately conduct an inquiry pursuant to Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), and ineffective assistance of counsel for failure to communicate with the Defendant; and (m) the introduction of Franqui's confession denied Defendant a fair trial; (11) Defendant is innocent of first-degree murder; (12) Defendant is innocent of the death penalty; (13) improper burden-shifting; (14) the jury received inadequate guidance concerning consideration of aggravating circumstances, and Florida's death penalty statute is unconstitutional; (15) ineffective assistance of counsel for failing to object to predication of Defendant's death sentence on an automatic aggravator; (16) ineffective assistance of counsel for failing to object to instructions which misled the jury that a majority vote was required; (17) the sentencing court erred in failing to find/consider mitigating circumstances apparent in the record, and newly available evidence establishes additional mitigation; (18) the trial court's sentencing order does not reflect an independent weighing or reasoned judgment; (19) rules prohibiting postconviction counsel from interviewing jurors violate Defendant's right to effective assistance of postconviction counsel; (20) the trial court and jury relied on misinformation, as reflected in Abreu's testimony; (21) execution by electrocution or lethal injection is cruel and unusual punishment; (22) Florida's capital sentencing scheme fails to prevent the arbitrary and capricious imposition of the death penalty; (23) ineffective assistance of counsel for failure to preserve issues for appeal and inviting error; (24) Defendant was denied a fair trial and effective assistance of counsel on various grounds (reciting sixteen claims raised on direct appeal); (25) ineffective assistance of counsel in pursuing postconviction remedies because trial counsel lost or misplaced files; (26) the trial court erred in refusing to give various jury instructions and to use special verdict forms, and trial counsel rendered ineffective assistance related thereto; (27) the trial court erroneously refused to consider the defendant's age as a mitigator and trial counsel rendered ineffective assistance related thereto; (28) the trial court erred in denying motions in limine and trial counsel rendered ineffective assistance related thereto; (29) the Florida Supreme Court ignored mitigating evidence, improperly weighed aggravators and mitigators, did not conduct a proper proportionality review, and did not conduct a proper harmless error analysis; and (30) the trial court should disqualify itself because one of the prosecutors is a judge in the Eleventh Circuit.
[4] In claim 30 Defendant sought recusal of Judge Alex Ferrer based on allegations that Ms. Marilyn Milian, one of the trial prosecutors and then a circuit court judge in the Eleventh Judicial Circuit, coerced Abreu to testify falsely. Judge Ferrer recused himself. Upon request from the Chief Judge of the Eleventh Circuit, the Chief Justice of this Court appointed Judge Paul L. Backman of the Seventeenth Judicial Circuit to preside.
[5] While San Martin also makes a blanket allegation that the trial court erred in denying claims 1-3 and 7-30, he makes specific arguments only as to claims 3, 9, 10, 11, 12, 17, 25, and 29. Thus, he has waived the remaining claims. See, e.g., Cooper v. State, 856 So.2d 969, 977 n. 7 (Fla.2003).
[6] San Martin's claim of ineffective assistance of counsel for failure to assert his low IQ as a basis for suppression of his confession was not raised in claim 10 below and therefore is not preserved. See, e.g., Kearse v. State, 969 So.2d 976, 987 n. 5 (Fla.2007). To the extent he raised this issue in claim 23, it was insufficiently pled below and, in addition, has not been preserved for appeal. See, e.g., Doorbal v. State, 983 So.2d 464, 482 (Fla.2008). San Martin's conclusory arguments on appeal are insufficient to preserve claims 11, 12 and 25, see, e.g., Peede v. State, 748 So.2d 253, 256 n. 5 (Fla.1999); Whitfield v. State, 923 So.2d 375, 378 (Fla.2005), and the claims are without merit. We affirm the denial of claim 17 as facially insufficient. See, e.g., Vining v. State, 827 So.2d 201, 212 (Fla.2002). Finally, we affirm the denial of claim 29 as inappropriately raised in a postconviction proceeding. See, e.g., Wright v. State, 857 So.2d 861, 874 (Fla.2003).
[7] San Martin's second sub-claim alleged ineffective assistance of counsel for failure to cross-examine witnesses. He has not appealed the summary denial of this portion of claim 3.
[8] Defendant and his family came to the United States from Cuba in 1980.
[9] Counsel also presented testimony from Defendant's grandmother, Paulina Martinez, and another brother, Juan San Martin. Juan testified that he lived in a loving environment, his parents provided for the family financially, and his parents were not abusive. He also testified, however, that his parents are separated because of his father's drinking.
[10] The trial court's sentencing order reflects that Defendant's family members' testimony refuted his contention of abuse at the hands of his alcoholic father: "[T]he suggestion by the defendant to Dr. Marina that he was mistreated by his alcoholic father was resoundingly refuted by every member of the defendant's family who testified."
[11] The sentencing court also found this aggravator supported by the two attempted first-degree murder convictions in this case. Again, however, the State agreed these must be vacated under Gray, 654 So.2d 552.
[12] We also note that since his sentencing for the Lopez murder, San Martin has been convicted of first-degree murder of a law enforcement officer, armed robbery, aggravated assault, grand theft, and burglary in connection with the January 3, 1992, shooting death of Officer Steven Bauer during a bank robbery. See San Martin v. State, 717 So.2d 462, 464 (Fla. 1998). We affirmed his conviction, but reversed his death sentence (imposed over the jury's life recommendation), on direct appeal. Id. at 472. The evidence in that case showed that San Martin was a participant in the robbery, but was not armed and fired no shots at the victim. Id. at 472. If we were to reverse Defendant's death sentence, these convictions could also be used to support the prior violent felony aggravating factor on resentencing. See Lucas v. State, 841 So.2d 380, 387 (Fla. 2003) ("[A] resentencing court is not limited by evidence presented (or not presented) in either the original guilt phase or sentencing phase."); Teffeteller v. Dugger, 734 So.2d 1009, 1024 (Fla.1999) ("[T]he statutory aggravating circumstance of `previously convicted of another capital felony or of a felony involving the use or threat of violence to the person' applies to any such crime for which there was a conviction at the time of sentencing.'" (citing King v. State, 390 So.2d 315, 320 (Fla. 1980), receded from on other grounds by Strickland v. State, 437 So.2d 150 (Fla. 1983))).
[13] San Martin also alleges trial counsel was ineffective for failing to object to the State's closing argument "wherein the State ridiculed and basically accused the defense of fabrication." However, he did not raise this argument below and it is therefore not preserved. See, e.g., Blanco, 963 So.2d at 178; Kearse, 969 So.2d at 987 n. 5.
[14] The trial judge, who also presided over San Martin's trial in the instant case, overrode the jury's recommendation of life but we reversed that override. See San Martin, 717 So.2d at 472.