# Supreme Court of Florida

_____

No. SC2025-0891
_____

**MICHAEL BERNARD BELL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 8, 2025

PER CURIAM.

Michael Bernard Bell, a prisoner under two sentences of death and an active death warrant, appeals the circuit court's denial of his successive motion for postconviction relief. He also seeks a stay of execution for the purpose of further factual development and requests oral argument. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. As we explain below, we affirm the denial of Bell's successive postconviction motion, and we deny his motion for a stay of execution and request for oral argument.

**FACTS AND PROCEDURAL BACKGROUND**

Bell was convicted of the 1993 first-degree murders of Jimmy West and Tamecka Smith. The facts surrounding the murders were set forth in this Court's opinion on direct appeal:

> In June 1993, Theodore Wright killed Lamar Bell in a shoot-out which was found to be justifiable homicide committed in self-defense. Michael Bell then swore to get revenge for the murder of his brother, Lamar Bell. During the five months following Lamar Bell's death, Michael Bell repeatedly told friends and relatives he planned to kill Wright. On December 8, 1993, Michael Bell, through a girlfriend, purchased an AK-47 assault rifle, a thirty-round magazine, and 160 bullets. The next night, Bell saw Theodore Wright's car, a yellow Plymouth. Bell left the area and shortly returned with two friends and his rifle loaded with thirty bullets. After a short search, he saw the yellow car in the parking lot of a liquor lounge. Bell did not know that Wright had sold the car to Wright's half-brother, Jimmy West, and that West had parked it and had gone into the lounge. Bell waited in the parking lot until West left the lounge with Tamecka Smith and another female. Bell picked up the loaded AK-47 and approached the car as West got into the driver's seat and Smith began to enter on the passenger's side. Bell approached the open door on the driver's side and at point-blank range fired twelve bullets into West and four into Smith. The other female ducked and escaped injury. After shooting West and Smith, Bell riddled with bullets the front of the lounge where about a dozen people were waiting to go inside. Bell then drove to his aunt's house and said to her, "Theodore got my brother and now I got his brother."
>
> [Bell] was charged with two counts of first-degree murder. At trial in March 1995, [Bell] pleaded not guilty by reason of self-defense, stating that he believed West

had reached for a weapon just before [Bell] began shooting. The defense presented no evidence or witnesses. A jury found [Bell] guilty of the first-degree murders of Smith and West and unanimously recommended the death penalty for both murders. During the penalty phase, a lounge security guard testified for the State that he and seven or eight other people were in the line of fire and hit the ground when [Bell] sprayed bullets in the parking lot of the lounge. He also testified that [Bell] shot four or five bullets into a house next door in which three children were residing at the time. The State introduced a copy of a record showing that [Bell] was convicted of armed robbery in 1990. Also during the penalty phase, [Bell]'s mother testified for the defense that she and [Bell] had received death threats from Wright and West. She testified that [Bell] was in good mental health and was gainfully employed and that she believed he did not commit the murders.

*Bell v. State,* 699 So. 2d 674, 675-76 (Fla. 1997).

The trial court sentenced Bell to death, having found three aggravating factors: Bell was previously convicted of another capital felony or of a felony involving the use or threat of violence (prior violent felony); the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and in committing the murders, Bell knowingly created a great risk of death to many persons. *Id.* at 676 n.1. The trial court also found one "marginal" statutory mitigating

- 3 -

circumstance, that Bell was under extreme mental or emotional distress at the time of the murders. *Id.* at 676 n.2.

We affirmed Bell's convictions and sentences on direct appeal. *See id.* at 679.[1] His convictions and sentences became final when the United States Supreme Court denied certiorari review on February 23, 1998. *See Bell v. Florida*, 522 U.S. 1123 (1998).

Bell subsequently filed a motion for postconviction relief. In December 1999, the circuit court summarily denied Bell's motion. Bell appealed the summary denial to this Court and, after holding oral argument, this Court reversed and remanded the case for an evidentiary hearing. *See Bell v. State*, 965 So. 2d 48, 54 (Fla. 2007); *Bell v. State*, 790 So. 2d 1101 (Fla. 2001). The evidentiary hearing was held in 2002.

Following the evidentiary hearing, the circuit court denied relief. Bell appealed the circuit court's order and also filed a

---

1. Bell's issues on direct appeal were: (1) the trial court erred in failing to conduct proper inquiries under *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973), and *Faretta v. California*, 422 U.S. 806 (1975); (2) the trial court erred in finding the CCP aggravating factor; (3) the trial court gave an erroneous CCP instruction; and (4) the trial court failed to properly consider and find mitigating circumstances.

petition for writ of habeas corpus. This Court affirmed the denial of

postconviction relief[2] and also denied Bell's habeas petition.[3] *See*

---

2. This Court concluded that several postconviction claims were procedurally barred: (1) improper prosecutorial comments regarding jury deliberations; (2) *Brady v. Maryland*, 373 U.S. 83 (1963), violation; (3) erroneous finding as aggravation that the defendant knowingly created a great risk of death to many persons; (4) improper prosecutorial remarks to the jury during voir dire; and (5) erroneous consolidation of Bell's two charges for trial.

This Court considered and rejected the following claims of ineffective assistance of counsel: (1) failure to object to prosecutorial comments regarding the plea of Dale George; (2) improper questioning of defense witness during the penalty phase; (3) ineffective assistance in advising Bell not to testify; (4) failure to object to improper prosecutorial comments; (5) failure to discover tape containing recorded statement that would have refuted key testimony; (6) failure to call a certain impeachment witness; (7) failure to investigate and present a credible defense; (8) improper closing arguments by defense counsel; (9) failure to object to shackling; (10) failure to ensure that competency reports contained information outlined in Florida Rule of Criminal Procedure 3.211; (11) improper defense concession of Bell's guilt and the existence of CCP; (12) failure to get court's ruling on motion to strike voir dire panel due to spectator's t-shirt memorializing victim Smith; (13) failure to object to comments made in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985); (14) failure to object to State's peremptory strike; (15) failure to investigate and prepare for testimony of State witnesses; (16) failure to investigate and present mitigating factors; (17) failure to ensure that the jury venire was sworn before voir dire began; and (18) cumulative error. *See Bell*, 965 So. 2d at 56-75.

3. Bell raised the following claims in his habeas petition: (1) Bell's death sentence was unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000); (2) the trial court gave

*Bell*, 965 So. 2d 48. The United States Supreme Court denied certiorari review in *Bell v. Florida*, 552 U.S. 1011 (2007).

In the years since this Court affirmed the denial of Bell's initial motion for postconviction relief and denied habeas relief, Bell filed multiple successive motions for postconviction relief. *See Bell v. State*, 91 So. 3d 782 (Fla. 2012) (rejecting Bell's claim regarding the retroactive application of the United States Supreme Court's decision in *Porter v. McCollum*, 558 U.S. 30 (2009)); *Bell v. State*, No. SC16-369, Order (Fla. Oct. 10, 2016) (affirming circuit court order "striking Bell's second successive postconviction motion"); *Bell v.*

---

unconstitutional jury instructions; (3) appellate counsel was ineffective due to improper argument that Bell should have been permitted to represent himself at trial; (4) appellate counsel was ineffective due to the failure to raise the excusal for cause of a prospective juror; (5) appellate counsel was ineffective due to the failure to raise the trial court permitting Bell to wear his jail uniform in front of the jury; (6) appellate counsel was ineffective due to the existence of a conflict of interest which rendered appellate counsel's assistance ineffective; (7) appellate counsel was ineffective due to the failure to raise on direct appeal the issue of erroneous jury instructions; and (8) appellate counsel was ineffective due to the failure to argue on direct appeal that comments made in voir dire were reversible error. *See Bell*, 965 So. 2d at 75.

- 6 -

*State*, 235 So. 3d 287, 287-88 (Fla. 2018) (concluding that *Hurst*[4] did not apply retroactively to Bell's sentences of death and affirming the denial of postconviction relief); *Bell v. State*, 284 So. 3d 400, 401-02 (Fla. 2019) (affirming, on grounds of untimeliness and a procedural bar, the denial of Bell's successive ineffective assistance of counsel claim that defense counsel improperly injected racial animus into the guilt and penalty phases of his trial, and rejecting Bell's retroactivity argument regarding the United States Supreme Court's decision in *Buck v. Davis*, 580 U.S. 100 (2017)).

Bell has also sought relief in federal court. *See Bell v. Fla. Att'y Gen.*, 461 F. App'x 843 (11th Cir. 2012) (affirming the dismissal of Bell's pro se habeas petition where the district court found that the petition was untimely); *Bell v. Bondi*, 572 U.S. 1118 (2014) (denying U.S. Supreme Court certiorari review); *Bell v. Fla. Att'y Gen.*, 2016 WL 11048052 (M.D. Fla. Apr. 5, 2016) (dismissing for lack of jurisdiction Bell's motion to reconsider his attempt to litigate a second federal habeas petition); *Bell v. Fla. Att'y Gen.*,

---

4. *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020).

2017 WL 11622107 (11th Cir. June 19, 2017) (denying certificate of appealability); *Bell v. Jones*, 584 U.S. 982 (2018) (denying certiorari review). A motion for leave of court to file a successive federal habeas petition was also denied in 2017.

Governor Ron DeSantis signed Bell's death warrant on June 13, 2025, and set an execution date of July 15, 2025. On June 18, 2025, Bell filed a successive motion for postconviction relief in the Fourth Judicial Circuit wherein he raised four claims.[5] Bell sought an evidentiary hearing only on the first claim relating to allegations of newly discovered evidence in the form of *Brady* and *Giglio* violations. Following a *Huff*[6] hearing on June 20, 2025, the

---

5. Bell raised the following claims in his successive motion for postconviction relief: (1) prosecutors failed to disclose evidence to Bell in violation of *Brady v. Maryland* and *Giglio v. United States*, 405 U.S. 150 (1972), which deprived him of due process and a fair trial; (2) Bell's capital trial was irredeemably tainted with racial bias by both the prosecution and his own defense attorney; (3) the time limits imposed on this warrant litigation violate state and federal due process; and (4) Bell has been denied due process and the effective assistance of counsel at every stage of his case, and his execution would violate the Eighth and Fourteenth Amendments.

6. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

circuit court granted an evidentiary hearing on the newly discovered evidence claim.

On the night of June 22, 2025, the night before the evidentiary hearing, Bell filed an amended motion raising further *Brady* and *Giglio* claims.

The trial court held an evidentiary hearing on June 23, 2025, at which Bell presented an additional claim of newly discovered evidence. On June 24, 2025, the circuit court entered its order denying relief, and this appeal follows.

## ANALYSIS

Bell raises four issues in this successive postconviction appeal. Under Florida Rule of Criminal Procedure 3.851(d)(1), a motion for postconviction relief must be filed within one year of the date that a conviction and sentence become final. However, to avoid this procedural bar, Bell relies on an exception provided in rule 3.851(d)(2)(A) and claims that newly discovered evidence warrants a new guilt phase and a new penalty phase. *See* Fla. R. Crim. P. 3.851(d)(2)(A) ("No motion may be filed or considered under this rule if filed beyond the time limitation provided in subdivision (d)(1) unless it alleges: the facts on which the claim is predicated

were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence.").

The first two issues in this appeal relate to Bell's contention that in the course of investigating and prosecuting this case, Detective William Bolena (deceased) and Assistant State Attorney George Bateh engaged in a pattern of misconduct toward multiple witnesses. Bell asserts that the alleged misconduct resulted in the presentation of false testimony in violation of *Giglio* and the withholding of exculpatory or impeachment evidence in violation of *Brady*, and that the witness statements revealing this alleged misconduct constitute newly discovered evidence. In issue one, Bell challenges the circuit court's rulings that permitted multiple evidentiary hearing witnesses to invoke their privilege against self-incrimination. In issue two, he challenges the circuit court's denial of his claims of newly discovered evidence. In issue three, Bell asserts that the totality of the circumstances surrounding alleged recantations and threats of perjury deprived him of fair and reliable proceedings, and, in issue four, he challenges the timeframe for his death warrant. As we explain, we affirm the circuit court's order.

- 10 -

## I. Invoking the Privilege Against Self-Incrimination

Bell first argues that during the evidentiary hearing on his claims of newly discovered evidence, the circuit court erred in permitting certain witnesses to invoke their privilege against self-incrimination. Henry Edwards, Charles Jones, Ericka Williams,[7] Vanness "Ned" Pryor, and Dale George—each of whom was a trial witness for the State—invoked the Fifth Amendment at some point during their testimony as a defense witness during the June 23 evidentiary hearing. With the exception of a few questions, Jones refused to provide direct answers throughout his testimony and repeatedly invoked his privilege against self-incrimination. Bell argues that allowing these witnesses to do so prevented him from being able to develop additional newly discovered evidence relating to alleged police/prosecutorial misconduct and trial witness impeachment.

Bell's argument is without merit. This Court has explained:

---

7. Ericka's first name is also spelled "Erica" in various places in the record. At the time of the evidentiary hearing, Ericka's last name was "Braclet." However, this opinion will refer to her by "Williams," her last name at the time of Bell's trial.

The privilege afforded by the constitutional guarantee against self-incrimination extends not only to answers that would themselves support a conviction but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the witness for a crime. *Hoffman v. United States*, [341 U.S. 479 (1951)] (reversing a conviction for contempt for failure to answer questions before a Federal grand jury investigating frauds against the United States and other Federal crimes); *accord Blau v. United States*, [340 U.S. 159 (1950)] (reversing contempt conviction for failure to answer Federal grand jury questions about the Communist Party of Colorado).

*State ex rel. Mitchell v. Kelly*, 71 So. 2d 887, 894 (Fla. 1954).

"Further, the matter of deciding what answers may incriminate or tend to incriminate is not solely up to the witness himself but is one requiring the exercise of the sound discretion of the trial court under all the circumstances of the case." *See id.* at 897 (citing *Ex parte Senior*, 19 So. 652 (Fla. 1896)). Thus,

[o]nce an individual has invoked his privilege against self-incrimination, it becomes the duty of the trial court to determine whether there is a reasonable basis for the assertion of the privilege and whether the privilege has been invoked in good faith. To sustain the privilege it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

*St. George v. State*, 564 So. 2d 152, 155 (Fla. 5th DCA 1990) (citing *Emspak v. United States*, 349 U.S. 190 (1955); *Hoffman*, 341 U.S. 479).

By the time of the evidentiary hearing on June 23, 2025, each of these witnesses had testified at Bell's trial and at Bell's 2002 evidentiary hearing. Days after Bell's death warrant was signed, Edwards and Jones signed sworn affidavits purporting to recant portions of their trial testimony. Williams, Pryor, and George refused to provide Bell's investigators with a sworn affidavit but spoke with the investigators, providing information that Bell claims prompted him to amend his successive postconviction motion. It was in this landscape that the circuit court, on its own initiative, offered these witnesses the appointment of counsel for the purpose of the evidentiary hearing and provided them, if they so desired, the opportunity to consult with counsel.

The circuit court did not err in permitting each witness to invoke the privilege against self-incrimination. The State's brief described—and Bell acknowledged—two of the potential legal risks, risks that we note would inform the circuit court's analysis of

- 13 -

whether there was a reasonable and good faith basis for invoking

the privilege:

> If the witnesses' testimony *at the evidentiary hearing* was false, then that would subject the witness to a charge of perjury by contradiction. § 837.021, Fla. Stat. Alternatively, if a witness testified that the sworn affidavit they signed a week ago was false, then they could be charged with perjury in official proceedings. § 837.02(2), Fla. Stat. In either scenario, the crime would not be completed until they offered that perjured testimony at the hearing.

Answer Brief of Appellee at 61 n.13; *see* Reply Brief of Appellant at

22-23 ("Counsel agrees with the legal theory stated in State's

footnote 13 at AB 61."). Although these risks were discussed in a

separate discussion—of what Bell describes as the "perjury threat"

faced by these witnesses—they are also legitimate concerns with

respect to whether they properly invoked the privilege against self-

incrimination. Simply put, these risks would be among the

reasonable considerations for the circuit court as it determined,

"under all the circumstances of the case," whether "answers may

incriminate or tend to incriminate." *Mitchell*, 71 So. 2d at 897.

Further, to the extent that Bell alleges that the witnesses'

invocation of the privilege against self-incrimination violated his

Sixth Amendment right of confrontation in this successive

postconviction proceeding, this claim is without merit. *See Rodgers v. State*, 948 So. 2d 655, 663 (Fla. 2006) (stating that "a defendant's rights under the Confrontation Clause apply to the guilt phase, the penalty phase, and sentencing"); *Rodriguez v. State*, 753 So. 2d 29, 43 (Fla. 2000) (stating the "uncontroverted proposition that the Sixth Amendment right of confrontation applies to all three phases of the capital trial").

## II. Newly Discovered Evidence/*Brady* Claim/*Giglio* Claims

Bell argues that recently obtained statements from multiple trial witnesses that constitute newly discovered evidence of *Brady* and *Giglio* violations would result in his acquittal on retrial or result in him receiving a lesser sentence. He appeals the circuit court's denial of relief as to all of his newly discovered evidence claims. Bell is not entitled to relief.

A *Brady* violation occurs where the State fails "to disclose material information within its possession or control that is favorable to the defense." *Taylor v. State*, 62 So. 3d 1101, 1114 (Fla. 2011). To establish a *Brady* violation, Bell has the burden to show "(1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and

(3) because the evidence was material, the defendant was prejudiced." *Id.* (emphasis omitted) (citing *Hurst v. State*, 18 So. 3d 975, 988 (Fla. 2009)). To satisfy the materiality prong, Bell must demonstrate a reasonable probability that, had the suppressed evidence been disclosed, the jury would have reached a different verdict. *Id.* "[A] 'reasonable probability' [is] 'a probability sufficient to undermine confidence in the outcome.'" *United States v. Bagley*, 473 U.S. 667, 682 (1985) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

Bell also asserts that his newly discovered evidence establishes *Giglio* violations, which are "based on the prosecutor's knowing presentation at trial of false testimony against the defendant." *Jimenez v. State*, 265 So. 3d 462, 479 (Fla. 2018) (quoting *Guzman v. State*, 868 So. 2d 498, 506 (Fla. 2003)). In order to establish a *Giglio* violation, "a defendant must prove that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." *Taylor*, 62 So. 3d at 1114 (citing *San Martin v. State*, 995 So. 2d 247, 254 (Fla. 2008)). "If the defendant establishes that a prosecutor has knowingly presented false

testimony, the burden then shifts to the State to prove that there is not any reasonable possibility that the false testimony could have affected the judgment of the jury." *Id.* (citing *Guzman*, 868 So. 2d at 506).

Further, to prove that either *Brady* or *Giglio* violations constitute newly discovered evidence, Bell must demonstrate the following:

> First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence."
> Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.

*Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (alteration in original) (internal citation omitted). Because Bell seeks to vacate his death sentence, to establish the second prong of *Jones*, Bell must show that "the newly discovered evidence would probably yield a less severe sentence." *Long v. State*, 271 So. 3d 938, 942 (Fla. 2019) (quoting *Walton v. State*, 246 So. 3d 246, 249 (Fla. 2018)).

"When the lower court has ruled on a claim following an evidentiary hearing, we review 'the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence.' The lower 'court's application of the law to the facts,' however, is reviewed de novo." *Dailey v. State*, 283 So. 3d 782, 788 (Fla. 2019) (quoting *Green v. State*, 975 So. 2d 1090, 1100 (Fla. 2008)).

Bell's claims of newly discovered evidence based on alleged *Brady* and *Giglio* violations are without merit, and we affirm the circuit court's denial of relief. The circuit court characterized these claims as follows:

> A common theme with all of Defendant's newly discovered witnesses is that they all allegedly made incredible statements to investigators for Defendant's federal counsel, after the death warrant was signed, about systemic prosecutorial misconduct that resulted in all their trial testimony being coerced and false. However, once Defendant called them to the stand their testimony did not support Defendant's allegations. The testimony did not demonstrate prosecutorial misconduct, but rather that the State leveraged the law permissibly to prosecute Defendant's crimes.

We agree with this characterization of Bell's claims.

We begin with the alleged recantations of Henry Edwards and Charles Jones raised in Bell's June 18 successive postconviction

motion, and we continue with the additional witnesses raised in Bell's June 22 amended motion and at the June 23 evidentiary hearing. In addition to the circuit court's findings that all of the claims are untimely, also dispositive of all of these claims of newly discovered evidence is that Bell has failed to demonstrate that the alleged newly discovered evidence is "of such nature that it would probably produce an acquittal on retrial," *Jones*, 709 So. 2d at 521, or that it "would probably yield a less severe sentence," *Long*, 271 So. 3d at 942.

## A. Alleged Recantations of Henry Edwards and Charles Jones

Bell's June 18 successive postconviction motion alleged that two witnesses, Edwards and Jones, recanted significant portions of their trial testimony. One of Bell's federal public defenders, attorney Tennie Martin, testified at the evidentiary hearing that after learning of the signing of Bell's death warrant, she received a call from attorney Linda McDermott, a federal public defender in another region. According to Martin, McDermott told her that "her investigator [Dan Ashton] may have, in the course of his investigation, over the last couple of months in a case of theirs, had

- 19 -

contact with a couple of witnesses in Mr. Bell's case and there may be information."

After further coordination to determine how to proceed, and after contacting Bell's postconviction attorney, Robert Norgard, two federal investigators contacted Edwards and Jones and obtained signed, sworn statements from them regarding their trial testimony.

We have explained that recantations, as a general matter, are highly unreliable as a form of newly discovered evidence. *Sweet v. State*, 248 So. 3d 1060, 1066 (Fla. 2018) (quoting *Consalvo v. State*, 937 So. 2d 555, 561 (Fla. 2006)). Although Bell asserts that Edwards's and Jones's alleged recantations constitute newly discovered evidence warranting relief, the analysis does not end with the recantation itself:

> Regardless of the time span from the time of trial to the discovery of the new testimony, recanted testimony cannot be "discovered" until the witness chooses to recant. . . .
>       . . . However, permitting a newly discovered evidence claim to proceed to an evidentiary hearing does not establish that the recanted testimony qualifies as newly discovered evidence as a matter of law. The newly discovered evidence claim remains to be factually tested in an evidentiary hearing to determine whether the defendant has demonstrated that the successive motion has been filed within the time limit for when the

statement was or could have been discovered through the exercise of due diligence.

*Davis v. State*, 26 So. 3d 519, 528-29 (Fla. 2009) (emphasis and internal citations omitted).

### 1. Timeliness

Although it considered Bell's claims on the merits, the circuit court concluded that the newly discovered claims as to Edwards and Jones were untimely:

> Defendant contends the Edwards and Jones claims fall under the newly discovered evidence exception of Rule 3.851(d) because they could not have been discovered with the use of due diligence by either himself or counsel until after Capital Habeas Unit ("CHU") Attorneys for the Northern District of Florida . . . contacted Defendant's CHU Attorneys, who are with the Middle District of Florida. Defendant alleges that there is no communication between employees of different CHU regions and, thus, there was no way for him to know that CHU North attorneys were in contact with witnesses from his case many months ago. Even accepting this alleged lack of communication, Defendant did not explain why CHU North waited to reveal the alleged recantations of two witnesses who testified against Defendant until after the death warrant was signed. Nor did Defendant ever state or present credible evidence to establish which CHU unit first learned of the purported new evidence and when that occurred. Fundamentally, Defendant did not prove that it has been less than one year since Henry Edwards and Charles Jones allegedly recanted. Therefore, Subclaims One and Two are untimely.

We agree with the circuit court's conclusion.

- 21 -

## 2. Henry Edwards

At trial, Edwards testified that he first met Bell at a neighborhood establishment and saw him frequently over a period of six months. On the night of the murders, Edwards was standing outside of the liquor lounge when he saw Bell pull a ski mask over his face and reach into the back seat of a car. When Bell walked around the car, Edwards saw that Bell was holding a rifle with a gun clip. Bell initially walked towards Edwards but then walked toward a car and started shooting into it. Edwards only saw one gunman. In 2002, Edwards reaffirmed his testimony at the evidentiary hearing on Bell's initial motion for postconviction relief.

On June 16, 2025, investigators spoke with Edwards and obtained a sworn affidavit that purported to recant Edwards's testimony that he saw Bell commit the murders. According to the affidavit, (1) Edwards did not see the shooter because Edwards was inside of the liquor lounge at the time of the shooting and only heard gunshots, (2) Detective Bolena knew that Edwards did not see the shooter, (3) Detective Bolena told Edwards details of the case, (4) Detective Bolena granted Edwards favors in exchange for his testimony against Bell such as picking Edwards up from jail

and taking him to visit family, (5) before testifying at Bell's trial, Edwards only saw Bell twice, (6) when asked to view a lineup, Detective Bolena told Edwards who Bell was, (7) Detective Bolena placed Edwards in a holding cell with an eyewitness who gave him details about the murders, (8) Edwards felt threatened by Detective Bolena, (9) the prosecutor coached Edwards on his testimony, and (10) Edwards was promised a more lenient sentence in his own pending prosecution if he testified against Bell.

The affidavit also stated that Edwards was previously questioned by another investigator about Detective Bolena, and that Edwards wanted the truth to be known but would not have come forward had he not been approached by Bell's investigators.

Bell argues that this information constitutes newly discovered evidence in the form of *Brady* and *Giglio* violations, and that the evidence undermines both the identification of him as the shooter and the findings as aggravating factors that the murders were cold, calculated, and premeditated, and that, in committing the murders, Bell created a great risk of death to many persons.

However, at the evidentiary hearing, Edwards denied the contents of his affidavit. Edwards admitted he had been a

confidential informant for Detective Bolena and that Detective Bolena approached him in jail after finding out he was at the scene when the shootings took place. Edwards did state that before the trial, "I might have seen him one time but I didn't—I didn't know him."

However, Edwards also stated he was on the outside, not the inside, of the liquor lounge on the night of the murders. When questioned about the contradiction between that statement and the contents of the affidavit, Edwards admitted to signing the affidavit but said that "it wasn't true." Edwards stated he thought that the investigators were trying to make a movie about Bell, he did not write nor read the affidavit, and that he was trying to help Bell, whom he knew was under a death warrant.

The circuit court ultimately denied Bell's claim, finding that

Henry Edwards not only stood by his trial testimony, but also directly stated that the contents of the affidavit were not true. Edwards stated that he provided information to Detective Bolena, but nothing he told him or testified about at trial has changed. He acknowledged that he had signed the affidavit, but he did not read or write it and simply went along with what the CHU Investigators told him had happened because he did not want Defendant to be executed. When questioned about the specifics of his trial testimony Edwards invoked his right against self-incrimination except for the fact that he

> reiterated that he was outside of the liquor lounge when the shooting occurred.
>
> Edwards' failure to recant his previous testimony under oath at the evidentiary hearing is ultimately fatal to Defendant's claim. *Robinson v. State*, 707 So. 2d 688, 691 (Fla. 1998) ("The absence of direct testimony by the alleged recanting witness is fatal to this claim.").

The circuit court concluded that "[c]onsidering Edwards' failure to recant and his additional evidentiary hearing testimony, Defendant's claim that Edwards previously testified falsely is without merit." The court also concluded that any testimony about Edwards's role as a confidential informant was no longer relevant in light of Edwards's failure to recant his testimony and that the claim would be untimely "because Edwards' role as a confidential informant was discussed at Defendant's 2002 postconviction evidentiary hearing."

We affirm the circuit court's denial of relief. Bell has failed to prove either a *Brady* or a *Giglio* violation based on Edwards's statements. Even if we were to accept Edwards's affidavit as true—despite him having testified at the evidentiary hearing that the contents of the affidavit were not true—Bell can establish neither the materiality prong of *Brady*, nor the prejudice prong of *Giglio*.

Moreover, in addition to our agreement with the circuit court's determination that Bell's claim is untimely, in light of the overwhelming evidence of Bell's guilt and evidence in support of the aggravating factors found by the trial court, Bell cannot establish for purposes of a newly discovered evidence claim that the evidence would probably produce an acquittal on retrial or that he would probably receive a lesser sentence.

The overwhelming evidence presented at Bell's trial established that for some time before the murders, Bell told multiple people that he wanted revenge on Theodore Wright for killing Bell's brother months earlier. Bell, under the guise of needing a gun for protection, asked his then-girlfriend, Ericka Williams, to buy an AK-47. The day before the murders, Bell accompanied Williams to buy an AK-47, magazine devices, and bullets. Bell took the gun and other items after he and Williams left the gun store.

On the night of the murders, Bell's close friend, Dale George, rode with Bell to the liquor lounge in Bell's car. Bell retrieved the AK-47 from the back seat of his car, placed a mask over his head, and walked to the car that West, Smith, and another woman were

entering. Bell fired multiple shots, hitting West and Smith, and then ran back to his car where George had moved into the driver's seat. Bell continued to fire the AK-47 at the lounge while trying to escape. During the penalty phase, jurors learned that while shooting at the lounge, multiple bullets struck a nearby house.

George drove away from the crime scene and returned to his car and departed from Bell. Bell then went to his aunt's home and, while there, told his aunt and Williams (who came to the home at Bell's request) that he killed West and an unknown female victim. George later pleaded guilty to accessory after the fact for driving Bell away from the crime scene.

### 3. Charles Jones

Bell also points to the alleged recantation by Charles Jones. At trial, Jones testified that he had known Bell for about ten years. Days after the murders, he saw Bell anxiously trying to sell an AK-47 for less than what Jones knew to be the street value for such a gun. Jones said that Bell reduced the price in an effort to get rid of the gun and was still unable to sell it.

Weeks later, Jones saw Bell and asked him why he killed West. Bell responded that he killed West because Wright killed his

brother, Lamar Bell. Bell told Jones that Smith was at the wrong place at the wrong time.

Detective Bolena visited Jones in jail after Jones pled to an unrelated federal charge. Jones recounted the events to Bolena. Several weeks later, Jones gave a sworn statement to the state attorney's office.

At the time of his trial testimony, Jones was awaiting federal sentencing. Although there had not been a formal plea deal, Jones hoped that the sentencing judge would consider his cooperation in the Bell case.

On cross-examination, Jones admitted that he did not like Bell and that they had disputes in the past. Jones reaffirmed his trial testimony at Bell's 2002 evidentiary hearing.

On June 18, 2025, investigators met with Jones and obtained a sworn affidavit from him, wherein he stated that (1) Bell never attempted to sell him a gun, (2) Bell did not confess to the shootings, (3) Detective Bolena and the prosecutor coerced him into testifying against Bell and promised him a downward departure in his pending federal sentencing, (4) the prosecutor threatened him with additional time in prison if he changed his testimony at the

2002 evidentiary hearing, and (5) Jones's sister was in a relationship with Detective Bolena at the time of the murders.

Bell argues that newly discovered evidence in the form of Jones's sworn statement establishes *Brady* and *Giglio* violations and creates reasonable doubt as to Bell's guilt and as to the finding of CCP. He argues that newly discovered evidence "would have cast doubt on the rest of the police investigation and by association the State's case." We disagree.

At the evidentiary hearing, Jones admitted that he signed the sworn affidavit but refused to answer almost all questions. The circuit court explained:

> At the evidentiary hearing, Charles Jones testified that his sister was in a relationship with Detective Bolena around the time of the instant case and that he signed the affidavit. As to any other questions, especially about the content of the affidavit, Mr. Jones invoked his right against self-incrimination. Accordingly, Jones did not recant and did not testify, leaving the Court nothing to evaluate the credibility of. Like the Edwards claim, this claim fails because Jones was not willing to testify to any of his alleged recantations and, thus, Defendant has failed to meet his burden of proof. Accordingly, this subclaim is denied.

We affirm the circuit court's denial of relief. Bell has not established either a *Brady* or a *Giglio* violation based on Jones's

statements. Bell challenges the circuit court's conclusion that Jones did not actually recant his trial testimony, but even if we were to accept Jones's affidavit as true—despite him invoking his privilege against self-incrimination virtually throughout his testimony at the evidentiary hearing—Bell can establish neither the materiality prong of *Brady,* nor the prejudice prong of *Giglio.* Moreover, Bell cannot establish for purposes of a newly discovered evidence claim that the evidence would probably produce an acquittal on retrial or result in a lesser sentence.

## B. Additional Witnesses

In addition to obtaining the sworn affidavits from Edwards and Jones, investigators contacted additional witnesses in the days after Bell's death warrant was signed: Ericka Williams, Vanness "Ned" Pryor, and Dale George. Each of these witnesses declined to provide a sworn affidavit but provided Bell's investigators with information that Bell argues is newly discovered evidence of investigatory or prosecutorial misconduct. At the evidentiary hearing, Bell also presented the testimony of Paula Goins, whose testimony he claims contains newly discovered evidence of misconduct.

Bell alleges as to each of these witnesses that "[b]ecause [the witness] describes similar police and prosecutorial misconduct that Edwards and Jones did in their sworn recantations, it also supports the recantations themselves and thus supports that the State presented false testimony and withheld exculpatory *Brady* and *Giglio* impeachment evidence concerning Edwards and Jones."

We address each of these witnesses in turn. However, we conclude as a threshold matter that the circuit court did not err in finding that these claims were untimely raised. Noting that Bell "previously raised claims of coercion as far back as his 2002 postconviction proceedings," the court concluded:

> Whatever precipitated Defendant to consider coercion claims for some trial witnesses should also have led him to conduct due diligence on the other remaining witnesses, especially in light of individuals who the State no longer had leverage over like Ned Pryor and Paula Goins. Defendant has failed to adequately allege why these claims were not discoverable with the use of due diligence during his previous postconviction proceedings.

### 1. Ericka Williams

At trial, Williams testified that she dated Bell from approximately June 1993 to March 1994. Bell lived with her during that time. Williams described Bell as "[c]onstantly" talking about

"[e]ven[ing] the score" with Wright after Bell's brother was killed. When Williams suggested that Bell's act of revenge might hurt innocent people, she recalled him saying that "[s]ometimes the good have to suffer with the bad."

In early December 1993, Bell told Williams that they needed to obtain a gun for protection and asked Williams to purchase an AK-47 in her name. On December 8, Bell accompanied Williams to a local gun store looking for an AK-47. The first store did not have one, so they went to another store.

The second gun store had an AK-47, and Williams purchased the gun in her name. At the same time, she purchased a 30-round magazine, another magazine-type device, and eight boxes of bullets totaling 160 bullets. Bell provided the cash that was used for the purchases. After they left the store, Bell took the gun and the other items.

On the night of December 9 and early morning hours of December 10, Dale George came to Williams's apartment and told her that "Michael got Theodore." George drove her to the liquor lounge where she saw a lot of police, and after which they returned to her apartment. After they arrived at her apartment, Bell called

and asked Williams to bring clothes for him to his aunt Paula Goins's home. George went home, and Williams took the clothes to Bell.

When Williams arrived at Goins's home, Goins answered the door and then went to her bedroom. Williams talked with Bell, who told Williams "[t]hat Theo killed his brother so he killed his, but an innocent girl got hurt so now the score is even." Williams also said that he planned to stay at Goins's house for a couple of days because it would take 72 hours for the gunpowder to wear off of his hands.

Williams testified that her relationship with Bell "cooled off some" after the murders. In March 1994, Bell asked Williams to report the gun stolen, and she did. In May 1994, she was questioned about the stolen gun report. Williams reaffirmed her trial testimony at Bell's 2002 evidentiary hearing.

In his amended successive postconviction motion, Bell alleged that Williams went to the Jacksonville Sheriff's Office where she was interrogated for 14-16 hours, and that Williams denied having any information about the murders until she was threatened with prosecution for her role in the case and with the removal of her

- 33 -

children from her custody. Bell also alleged that Williams was threatened with prosecution as an accessory to first-degree murder if she changed her testimony and that she falsely testified regarding her interactions with George after the murders.

At the June 23 evidentiary hearing, Williams testified that during the murder investigation she was taken "downtown" for questioning and placed in an interrogation room for 12-14 hours. During that time, some investigators screamed at her and were mean to her, and they threatened that her children would be taken away from her. On cross-examination, she stated that she did not recall buying the AK-47 and giving it to Bell, nor did she recall whether she tried to tell the truth at Bell's 2002 evidentiary hearing.

The circuit court denied Bell's claim as to Williams, finding that Bell did not prove his "allegations of newly discovered impeachment evidence that the State pressured and intimidated" Williams. The court found:

> [I]t appears the State generally outlined the reasonable possible outcomes Ms. Williams faced if she refused to testify pursuant to a subpoena about what she had heard Defendant say regarding the murders or her purchasing the gun Defendant used in the murder[s] for him, knowing Defendant was a convicted felon. Additionally, there is no evidence the State knowingly put on false

evidence through Erica [sic] Williams' trial testimony. Accordingly, Defendant has failed to meet his burden of proof and this subclaim is denied.

Given that we agree with the circuit court's conclusion that Bell's claim as to Williams was untimely and that the claim fails on the merits, we affirm the circuit court's denial of relief.

### 2. Vanness "Ned" Pryor

At trial, Ned Pryor testified that he was good friends with Bell. On the night of the murders, Pryor was driving down the street in his car. He saw Bell driving in Bell's car, and Bell asked Pryor to follow him. Dale George was sitting in the front passenger seat of Bell's car.

Pryor followed Bell to the liquor lounge, where Bell pointed out Wright's car. Pryor was aware of the lingering dispute between Bell and Wright, and Bell had previously told Pryor that he wanted to get revenge on Wright for killing Bell's brother.

Pryor told Bell to leave the lounge, suggesting that it was too early for Wright to leave the lounge, but Bell decided to wait in the parking lot. Bell asked Pryor to park next to him, but Pryor refused and drove down the street to park.

Pryor saw Bell get out of the driver's side of the car and saw the AK-47. He did not see George get out of the passenger side of the car. Pryor was unable to see Bell's face from the distance at which he parked but recognized the AK-47 that Bell showed him the day before.

Pryor saw Bell walking in the direction of Wright's car. Pryor was unable to see Bell standing at the car but heard gunshots. Pryor drove home. Two days later, Bell and Pryor went for a ride in Bell's car. Bell admitted to killing West and Smith and asked Pryor not to say anything about it.

Months later, after being arrested on an unrelated misdemeanor charge, Detective Bolena questioned Pryor about the murders. Pryor told him about the events, and he gave a sworn statement to the state attorney's office the next day. About two months later, Pryor was arrested for felony drug possession and resisting arrest without violence, and his case was pending at the time of Bell's trial. Pryor reaffirmed his trial testimony at Bell's 2002 evidentiary hearing.

Like the Williams newly discovered evidence claim, Bell did not raise the claim with respect to Pryor until he filed his amended

- 36 -

successive postconviction motion. Bell alleged that Pryor was threatened with prosecution if Pryor did not testify falsely against Bell, and that Pryor was told what to say during his testimony, particularly, that he saw Bell with a gun. Pryor refused to sign a sworn affidavit.

At the evidentiary hearing, Pryor testified that he spoke with Bell's investigators on June 17, 2025, but he denied telling them that he was told to testify that Bell was the gunman. Pryor also testified that he did not recall being threatened. He said that he did not see Bell with a gun and was not at the scene, but, when questioned again, he invoked the Fifth Amendment. Pryor did not recall what he testified to at Bell's trial in 1995 or at the evidentiary hearing in 2002.

The circuit court concluded that Bell's "allegations of newly discovered impeachment evidence that the State pressured and intimidated Ned Pryor to testify are not proven," and that even if the court considered Pryor's denial that he was at the liquor lounge credible, Bell "failed to prove the State knowingly or should have known Ned Pryor's testimony at trial was false." This is especially the case in light of Dale George's testimony that Pryor, driving his

own car, followed Bell and George to the liquor lounge on the night of the murders.

We affirm the denial of the Pryor newly discovered evidence claim. In addition to the claim being untimely, Bell is unable to demonstrate that, in light of the other evidence introduced at trial, he probably would be acquitted on retrial or receive a lesser sentence.

### 3. Dale George

At trial, George testified that he was aware that Bell had a grudge against Theodore Wright because Wright killed Bell's brother. On the night of the murders, George rode with Bell in Bell's car to the liquor lounge. Ned Pryor followed them in his own car. When they got to the lounge, Bell pointed out Wright's car. Suspecting that Bell was going to try to kill Wright, George told Bell that they should leave. Bell refused to do so. Bell parked the car and waited. During that time, Bell put on a mask, initially only placing it on the top of his head. After a while, Bell said "here they come." Bell got out of the car, pulled the mask over his face, retrieved an AK-47 from the back seat of the car, and walked towards Wright's car, during which time George moved into the

driver's seat to start the car. George heard gunshots. As Bell ran back to his car, he fired gunshots at the lounge. George drove back to the location where his car was and got out of Bell's car. Bell drove away.

After George left, he received a pager alert from Ericka Williams's phone number. George went to Williams's apartment, where George's then-girlfriend also lived. When George arrived, only Williams was there. He told Williams that Bell "shot up Theodore Wright" at the liquor lounge. Williams did not believe George, so he drove her to the lounge to see the scene for herself. George then took Williams back to her apartment, and Bell called Williams, asking Williams to bring some clothes to him at his aunt's house. George refused to take Williams to see Bell and left the apartment.

Detective Bolena questioned George about the murders several months later, at which time George denied knowing anything. About two months later, Detective Bolena talked with George again, that time revealing details about the murders. The following day, George gave a sworn statement to the state attorney's office.

Several days later, George pled to the charge of accessory after the fact for driving Bell away from the crime scene.

George testified at trial that he had not been sentenced but had agreed to a plea deal where in exchange for his guilty plea, he would receive no more than five years in state prison. George reaffirmed his trial testimony at Bell's 2002 evidentiary hearing.

In Bell's amended successive postconviction motion, Bell alleged that George told investigators that on multiple occasions, he was threatened with charges of first-degree murder if he did not testify against Bell, and that Detective Bolena once used physical violence against him while he was handcuffed. George refused to sign a sworn affidavit.

At the evidentiary hearing, George denied telling investigators that he was threatened with a first-degree murder charge if he did not testify against Bell. George invoked his privilege against self-incrimination as to subsequent questions.

The circuit court denied this newly discovered evidence claim, finding as it did with Williams and Pryor that Bell failed to prove his allegations of newly discovered impeachment evidence that the State pressured and intimidated George to testify, and finding "no

evidence" that the State knowingly presented false evidence through George's testimony. Moreover, for the purpose of a newly discovered evidence claim, Bell cannot establish that he would probably be acquitted on retrial or receive a lesser sentence.

Because this claim was untimely raised and lacks merit, we affirm the circuit court's denial of relief.

### 4. Paula Goins

Bell did not plead a claim of newly discovered evidence as to trial witness Paula Goins in his June 18 successive postconviction motion, nor did he include a claim involving her in his amended motion. The circuit court explained in its order that "Defendant did not allege a claim of newly discovered evidence involving Paula Goins in either his June 18 motion or his Amended Motion. Instead, he called Ms. Goins to testify and attempted to develop this claim on the fly through closing argument." Nonetheless, the court considered Bell's claim as to Goins "as a claim of newly discovered evidence that Paula Goins was coerced to testify through previously undisclosed pressure and threats by the State that could have been used to impeach her testimony."

At Bell's trial, Goins testified that she is Bell's aunt. After Bell's brother was killed, Bell told her about the events. Goins encouraged Bell to report Wright to law enforcement. Bell declined to do so, saying—in Goins's words—"Michael said prison was too good for him, he needs to be in the morgue like his [Bell's] brother."

About 2 a.m. on the morning of December 10, 1993, Bell called Goins, said that he was coming to her home, and arrived about an hour later. When Bell arrived, he was excited and told her what happened:

> PROSECUTOR: Miss Goins, you earlier said that when Michael Bell came to your door he was excited and my question to you is: I'd like for you to use the words that you remember Michael Bell using, what did he say when he first came in?
>
> WITNESS: He said I got that mother fucker.
>
> PROSECUTOR: I'm sorry, could you speak up?
>
> WITNESS: I got that mother fucker.
>
> PROSECUTOR: Did you respond to that?
>
> WITNESS: I asked him who.
>
> PROSECUTOR: What did Michael Bell say?
>
> WITNESS: Killer.
>
> PROSECUTOR: I'm sorry?

WITNESS: Killer.

PROSECUTOR: What did you say?

WITNESS: Who is that? I didn't know who he was.

PROSECUTOR: And what did Michael Bell say?

WITNESS: Theodore's brother.

PROSECUTOR: Who's [sic] brother?

WITNESS: Theodore.

PROSECUTOR: Did you know who Theodore was?

WITNESS: Yes.

PROSECUTOR: Who is that?

WITNESS: He's the boy that killed my nephew.

PROSECUTOR: Theodore Wright?

WITNESS: Yes.

PROSECUTOR: Did you then ask him to explain what happened?

WITNESS: Yes.

PROSECUTOR: What did Michael Bell tell you?

WITNESS: He said they had been – he and a friend had been riding and when he stopped at a red light the car that came up beside him he recognized it as being the car that Theodore Wright drove.

PROSECUTOR: Did he tell you whether he was able to see Theodore Wright in the car or not?

WITNESS: No.

PROSECUTOR: Did he tell you why?

WITNESS: The windows, he couldn't really tell, that car had tinted windows.

PROSECUTOR: Then what did he say happened?

WITNESS: He said he left and went to get his car.

PROSECUTOR: I'm sorry?

WITNESS: He left and he went to get his car.

. . .

PROSECUTOR: Miss Goins, did Michael Bell tell you who he was waiting for?

WITNESS: He said he was waiting for Theodore to come back out of the club.

PROSECUTOR: Did he make any mention about whether he believed Theodore Wright would be armed when he came out of that Moncrief Lounge?

WITNESS: He said they check for weapons and that he knew he wasn't.

PROSECUTOR: He knew he wasn't what?

WITNESS: Armed.

PROSECUTOR: That they check for weapons where?

- 44 -

WITNESS: Inside the place where he was at.

PROSECUTOR: Inside the lounge?

WITNESS: Yes.

PROSECUTOR: Did he tell you whether he saw anyone come out?

WITNESS: Yes.

PROSECUTOR: What did he say about that?

WITNESS: He saw a guy and two girls come out.

PROSECUTOR: What did he say he saw them do?

WITNESS: The guy – the guy was – the guy evidently purchased something and the girls were walking with him and they just went to the car.

. . .

PROSECUTOR: What did he say happened next?

WITNESS: That they came up onto the car and the guy had gotten in the car and was – Michael said he was reaching down to get his weapon from under the seat, that's when I knew that they didn't have weapons inside because Michael felt like he was – when he got back in the car he was reaching for – he was going to rearm himself with his weapon because he was known to carry a weapon.  And the girls were outside the car.

PROSECUTOR: Did he say where the girls were?  What part of the car they were at?

WITNESS: Yeah, they were waiting for him to let them in the car.

- 45 -

PROSECUTOR: Did he say which side of the car they were on?

WITNESS: On the passenger side.

PROSECUTOR: Then what did he say happened?

WITNESS: One of the girls spotted him then she tapped the other one on the shoulder and pointed at him.

PROSECUTOR: Would you keep your voice up?

WITNESS: And then she left but the other one stayed.

PROSECUTOR: Did he say where that woman went when she left the car?

WITNESS: She backed up, she went back to the place.

PROSECUTOR: To what place?

WITNESS: I guess the bar.

PROSECUTOR: Then what did he say happened?

WITNESS: The other girl asked the guy did he know her – did he know him, she said, Killer, do you know him?

PROSECUTOR: I'm having a very difficult time hearing you, ma'am.

WITNESS: The other girl – the other girl said to him, said, Killer, do you know him? And was pointing at him.

PROSECUTOR: Pointing at whom, who is him?

WITNESS: At Michael.

PROSECUTOR: Then what happened?

WITNESS: And then the guy turned around and looked at him and said who? That's the first time Michael knew it was Killer.

PROSECUTOR: Who is Killer?

WITNESS: That was Theodore's brother.

PROSECUTOR: Theodore's brother?

WITNESS: (Nods) Michael didn't know it was him.

PROSECUTOR: Well, did Michael tell you how he felt when he saw that the man in the car was not Theodore Wright but Theodore Wright's brother?

WITNESS: Theodore was trying to kill Michael and he was relieved that it was him cause he was trying to kill Michael too.

PROSECUTOR: Did Michael tell you what he did once he saw it was Theodore Wright's brother in the car?

WITNESS: He shot him.

PROSECUTOR: Is that what Michael Bell told you he did?

WITNESS: Yes. Yes.

PROSECUTOR: Did Michael Bell ever use the words that he figured he hit the jackpot when he saw that it was Theodore Wright's brother?

WITNESS: I think so.

PROSECUTOR: I beg your pardon?

WITNESS: I think so, I think that's what he said.  He was – Michael was – Michael was afraid of that boy and he felt more threatened by Killer than he did Theodore because Killer was trying to kill him, and he was – when he realized it was him he just – I don't know.

PROSECUTOR: Is that what Michael Bell told you?

WITNESS: Yes.

PROSECUTOR: Did Michael Bell tell you what he did as he moved away from that car?

WITNESS: Said that he shot several rounds into some cars that were on the lot and houses or something or another, just to get away.

PROSECUTOR: Did you ask him about the girl that was in the car?

WITNESS: Yes.  He didn't mean to hurt her, he didn't even know that she was hurt.  Cause I asked him and he said she just fell, he didn't mean to hurt her, he wished she had left with the other girl, he could not understand why she stayed, but he never meant to hurt her.

At the June 23 evidentiary hearing, when asked whether she was threatened by Detective Bolena or the prosecutor during the murder investigation, Goins said: "I don't know.  Threaten is a strong word."  She explained that while being questioned, Detective Bolena stood very close to her, "crouched over" her, stared at her, and never sat down.  Goins was told that if she did not tell the truth, she would lose her job, custody of her granddaughter, and

her home. She was also told that there was a possibility of five years of incarceration if she committed perjury. She recalled hearing Bell's conversation with Williams on the night of the murders where he admitted to shooting the victims, but she said that Bell said "we" shot West and Smith, not "I" shot them. She suggested that Detective Bolena and Bateh "twist[ed]" her account with respect to whether Bell said "we" or "I," but she also stated that given the passage of time and the current state of her health, the transcript of her trial testimony would be accurate.

The circuit court found that Bell failed to prove his claim of newly discovered impeachment evidence in the form of threats toward Goins, and it also found no evidence that the State presented false evidence through Goins's testimony. The court explained:

> Ms. Goins was self-admittedly not threatened and her description of what she was told by the State does not constitute undue pressure, such as Detective Bolena staring at her and standing close to her. Rather, it appears to have generally outlined the reasonable possible outcomes if Ms. Goins refused to testify to what she had heard Defendant say about the murders.

Given the untimeliness of this insufficiently pled claim, Bell's failure to establish misconduct on the part of the State or law enforcement,

and his failure to establish a claim of newly discovered evidence in light of the overwhelming evidence of Bell's guilt, we affirm the denial of relief.

## C. Conclusion

Having considered each of Bell's newly discovered evidence claims, individually and cumulatively, we conclude that this claim is without merit and note this well-reasoned observation by the circuit court:

> Although Defense counsel insisted the testimony [as to claim one] established newly discovered impeachment evidence, the coercion evidence could have been discovered with due diligence. These are all witnesses with some relation to Defendant, it is reasonable that procuring their testimony might require some convincing. None of the testimony brought out at the evidentiary hearing demonstrates the State's actions were of such a threatening nature that they amounted to the prosecutorial misconduct necessary to warrant relief. Further, even if all this suggestion of supposed threats had been presented at trial, Defendant has failed to connect how the credibility of these witnesses is weakened. Defendant never makes the connection that the witnesses embellished or fabricated their testimony to avoid these threats. On the contrary, it appears all of them were appropriately aware of how important testifying truthfully was. Accordingly, to the extent it was not discussed before, the Court finds Defendant has failed to prove this evidence, both individually and cumulatively, is of such a nature that there is a reasonable probability of a different outcome had he known about it.

### III. Totality of the Circumstances

Bell also argued in his postconviction motion that the totality of the circumstances—relating to his claims of newly discovered evidence—warrants relief. He contends that the circumstances surrounding the alleged recantations by Edwards and Jones, combined with alleged perjury threats by the State to witnesses who testified at the June 23 evidentiary hearing, deprived him of a fair evidentiary hearing and warrant-phase postconviction process.

We conclude that there is no merit in this claim, and, based on our review of the record, we expressly reject Bell's allegation that the State threatened evidentiary hearing witnesses with perjury charges. Bell is not entitled to relief.

### IV. Death Warrant Timeframe

Bell argues that the warrant time period in his case is unreasonably short and that on the facts of his case, he was deprived of notice and an opportunity to be heard. This claim is without merit.

After Bell's death warrant was signed, the circuit court conducted an evidentiary hearing on Bell's newly discovered evidence claim. The court considered not only the newly discovered

evidence claims raised in Bell's June 18 motion, but those raised in the amended motion filed the night before the hearing, and the additional claim raised during the hearing. As the circuit court observed, "Defendant has not identified any matter on which he has been denied notice and an opportunity to be heard."

Moreover, this Court has recently considered and rejected claims challenging the time period set in death warrant cases. *See Tanzi v. State,* 407 So. 3d 385, 393 (Fla.) (noting that "this Court has previously rejected similar constitutional arguments attacking the compressed warrant litigation schedule" (citing *Barwick v. State,* 361 So. 3d 785, 789 (Fla. 2023))), *cert. denied,* 145 S. Ct. 1914 (2025).

**V. Motion for Stay of Execution**

In "Appellant's Motion for Stay of Execution and to Relinquish Jurisdiction for Further Fact Development," Bell requests that this Court stay his execution and relinquish his case to the circuit court for a new evidentiary hearing. Having fully considered Bell's motion and the issues that Bell raises in this appeal, because he has failed to establish "substantial grounds upon which relief might be granted," no stay is warranted. *See Gaskin v. State,* 361 So. 3d

300, 309 (Fla. 2023) (citing *Buenoano v. State*, 708 So. 2d 941, 952 (Fla. 1998)).

## CONCLUSION

For these reasons, we affirm the denial of Bell's successive motion for postconviction relief. We also deny Bell's motion for a stay of execution and his request for oral argument.

No rehearing will be entertained by this Court, and the mandate shall issue immediately.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

LABARGA, J., concurring in result.

I concur in the result because I am convinced that Bell was provided with adequate notice and opportunity to be heard in these successive postconviction proceedings. However, I feel compelled to again express my concerns about the extremely short time frame for this case and other recent death warrant cases.

I commend the work of all involved in what can only be described as a grueling post-warrant process that has taken place since the signing of Bell's death warrant on June 13, 2025. As is

clear from the record, the time period involved in this case is especially compact due to the June 23, 2025, evidentiary hearing involving multiple claims of newly discovered evidence.

An Appeal from the Circuit Court in and for Duval County,
    Jeb T. Branham, Judge
    Case No. 161994CF009776AXXXMA

Robert A. Norgard, Bartow, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, Christina Z. Pacheco, Senior Assistant Attorney General, Jonathan S. Tannen, Assistant Attorney General, and Joshua E. Schow, Assistant Attorney General, Tampa, Florida,

    for Appellee